NETFLIX, INC., Plaintiff,

v.

ROVI CORPORATION,
et al., Defendants.

Case No. 11–cv–6591 PJH

United States District Court,
N.D. California.

Signed July 15, 2015

Ashok Ramani, Michael S. Kwun, Sharif E. Jacob, Stacy S. Chen, Tia Alexandra Sherringham, Edward Andrew Bayley, Justina Kahn Sessions, Keker & Van Nest, LLP, San Francisco, CA, for Plaintiff.

Yar R. Chaikovsky, Hong Lin, Joel Chao–Lee Lin, Michael C. Hendershot, Philip Ou, Paul Hastings, Palo Alto, CA, Amol Parikh, Sruli Yellin, Mcdermith Will Emery LLP, Chicago, IL, David Lester Larson, McDermott, Will & Emery, Jeremiah Aaron Armstrong, Feinberg Day Alberti & Thompson LLP, Menlo Park, CA, Seungtaik Michael Song, Dechert LLP, Mountain View, CA, for Defendants.

### ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

PHYLLIS J. HAMILTON, District Judge

Plaintiff's motion for summary judgment came on for hearing before this court on March 25, 2015. Plaintiff (and counter-defendants) Netflix, Inc. ("plaintiff" or "Netflix") appeared through its counsel, Ashok Ramani, Tina Sessions, Ed Bayley, Michael Kwun, and Sharif Jacob. Defendants (and counter-claimants) Rovi Corporation, Rovi Technologies Corporation, Rovi Guides, Inc., United Video Properties, Aptiv Digital Inc., and Starsight Telecast, Inc. (referred to collectively as "defendants" or "Rovi") appeared through their counsel, Yar Chaikovsky, Hong Lin, and Amol Parikh. Having read the papers filed in conjunction with the motion and carefully considered the arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS plaintiff's motion as follows.

### BACKGROUND

This is a patent case. Plaintiff Netflix originally filed a declaratory judgment action against defendants, seeking declaratory judgments of non-infringement and invalidity of five Rovi patents. Rovi then filed counterclaims asserting infringement of those five patents, as well as three additional patents (for a total of eight patents). Netflix then answered Rovi's counterclaims with additional declaratory judgment counterclaims, for non-infringement and invalidity of the three newly-asserted patents.

Three of the patents have since dropped out of the suit, leaving five remaining patents, all of which are at issue on this motion: (1) U.S. Patent No. 6,898,762 ("the '762 patent"); (2) No. 7,065,709 ("the '709 patent"); (3) No. 7,103,906 ("the '906 patent"); (4) No. 7,945,929 ("the '929 patent"); and (5) No. 7,974,962 ("the '962 patent"). Four of these patents (the '762, '709, '929, and '962 patents) are related to interactive program guides, while the fifth (the '906 patent) is related to creating bookmarks for resuming playback across different devices.

For ease of reference in this order, the court will sometimes refer to the '762 and the '709 patents as the "Viewing History patents," as they relate to storing a user's viewing history and making recommendations based on that history; and will refer to the '929 and the '962 patents as the "Category patents," as they relate to the use of categories to organize programs. The court will refer to the '906 patent as the "Bookmarking patent."

Netflix's original complaint was filed on December 21, 2011. In May 2012, the court stayed the case pending the outcome of an International Trade Commission ("ITC") investigation. In July 2014, after the ITC proceedings had concluded, the parties stipulated to lift the stay, and agreed to a schedule for claim construction. Netflix then filed this motion for summary judgment under § 101, intending for it to be heard before claim construction, but the court consolidated the two hearings. Having recently issued a claim construction order, the court now turns to Netflix's motion for summary judgment.

## DISCUSSION

A. Legal Standards

1. Motions for Summary Judgment

A party may move for summary judgment on a "claim or defense" or "part of ... a claim or defense." Fed.R.Civ.P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.*

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir.2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may carry its initial burden of production by submitting admissible "evidence negating an essential element of the nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1105–06 (9th Cir.2000); *see also Celotex,* 477 U.S. at 324–25, 106 S.Ct. 2548 (moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case).

When the moving party has carried its burden, the nonmoving party must respond with specific facts, supported by admissible evidence, showing a genuine issue for trial. Fed.R.Civ.P. 56(c), (e). But allegedly disputed facts must be material—¶the existence of only "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505.

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Id.* at 255, 106 S.Ct. 2505; *Hunt v. City of Los Angeles*, 638 F.3d 703, 709 (9th Cir.2011).

2. Invalidity under Section 101

■ Section 101 of the Patent Act provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has found an important implicit exception to the boundaries of patentability, holding that "laws of nature, natural phenomena, and abstract ideas are not patentable." *Diamond v. Diehr*, 450 U.S. 175, 185, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981).

The line between an unpatentable abstract idea and a patentable invention has not always been a bright one, especially with regard to process patents (also called method patents). Courts have adopted various tests to delineate the boundaries of patentability, and in recent years, the tests have been revisited. The recent line of cases began in 1998, when the Federal Circuit held that a process could be patentable as long as it produced a "useful, concrete, and tangible result." *State Street Bank & Trust Co. v. Signature Financial Group, Inc.*, 149 F.3d 1368, 1373 (Fed.Cir.1998).

The "useful, concrete, and tangible result" test persisted until 2008, when an en banc panel of the Federal Circuit rejected it, and instead held that a "claimed process is surely patent-eligible under § 101 if: (1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *In re Bilski*, 545 F.3d 943, 954 (Fed.Cir.2008). The Federal Circuit further held that this "machine-or-transformation" test was "the sole test governing § 101 analyses." *Id.* at 955.

■ The *Bilski* case then reached the Supreme Court, which took a different view of the "machine-or-transformation" test. Rather than being the "sole test governing § 101 analyses," the Court held that the test was merely an "important and useful clue" regarding patentability. *Bilski v. Kappos*, 561 U.S. 593, 603, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010). Instead of focusing exclusively on the machine-or-transformation test, the *Bilski* Court looked more broadly at whether the patent-in-suit, covering a method for buyers and sellers of commodities to hedge against the risk of price fluctuations, was an attempt to claim an abstract idea.

■ The *Bilski* Court ultimately determined that the patent covered "the basic concept of hedging, or protecting against risk," which was an "unpatentable abstract idea," and in fact, was a "fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class." 561 U.S. at 611, 130 S.Ct. 3218. To find the patent valid would "pre-empt the use of this approach in all fields, and would effectively grant a monopoly over an abstract idea." *Id.* at 612, 130 S.Ct. 3218. The Court then made clear that "limiting an abstract idea

to one field of use or adding token postsolution components" would not turn an unpatentable abstract idea into a patentable method, noting that certain of the patent's claims "attempt to patent the use of the abstract idea of hedging risk in the energy market" (as opposed to all markets) or "instruct the user of well-known random analysis techniques to help establish some of the inputs into the equation," neither of which was sufficient to make the invention patentable. *Id.*

Two years later, in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.,* the Court shed further light on the boundaries of patentability under § 101. —— U.S. ——, 132 S.Ct. 1289, 182 L.Ed.2d 321 (2012). In *Mayo,* the Court was faced with patents on a process for helping doctors determine whether drug dosages for patients with autoimmune diseases were too low or too high. The key question before the Court was whether the claims covered an unpatentable law of nature (analogous to the *Bilski* Court's consideration of whether the claims covered an unpatentable abstract idea).

*Mayo* cited previous Supreme Court precedent warning against "upholding patents that claim processes that too broadly preempt the use of a natural law," and "insisting that a process that focuses upon the use of a natural law also contain other elements or a combination of elements, sometimes referred to as an 'inventive concept,' sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself." 132 S.Ct. at 1294 (internal citations omitted). In essence, the Court asked this question: besides the natural law itself, "[w]hat else is there in the claims before us?" *Id.* at 1297. In answering that question, the *Mayo* Court found that "the claims inform a relevant audience about certain laws of nature; any additional steps consist of well-understood, routine, conventional activity already engaged in by the scientific community; and those steps, when viewed as a whole, add nothing significant beyond the sum of their parts taken separately." *Id.* at 1298.

The *Mayo* Court emphasized that the refusal to allow patents on laws of nature arose out of a "concern that patent law not inhibit further discovery by improperly tying up the future use of laws of nature." 132 S.Ct. at 1301. While "rewarding with patents those who discover new laws of nature and the like might well encourage their discovery, those laws and principles, considered generally, are the basic tools of scientific and technological work," and allowing patents that "tie up their use will inhibit future innovation premised upon them, a danger that becomes acute when a patented process amounts to no more than an instruction to 'apply the natural law.'" *Id.*

■ Most recently, in *Alice Corp. Pty. Ltd. v. CLS Bank International,* the Court made clear that the two-step approach set forth in *Mayo* applied not only to patents relating to natural laws, but also to patents relating to abstract ideas. *Alice,* —— U.S. ——, 134 S.Ct. 2347, 189 L.Ed.2d 296 (2014). The *Alice* Court described *Mayo* as setting forth "a framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts," and described the framework as follows: "First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask 'what else is there in the claims before us?'" *Alice,* 134 S.Ct. at 2355 (internal citations omitted). The *Alice* Court then explained that "[w]e have described step two of this analysis as the search for an 'inventive concept'—i.e., an element or combination of elements that is sufficient to ensure that the patent

in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* (internal citations omitted).

The *Alice* Court then applied that two-part test to the patents before it, which covered a computerized method for mitigating "settlement risk," described as "the risk that only one party to an agreed-upon financial exchange will satisfy its obligation." Specifically, the claimed processes were designed to "facilitate the exchange of financial obligations between two parties by using a computer system as a third-party intermediary." The computer system would track each party's ability to satisfy its financial obligations, and would ultimately use that data to provide instructions to each party for carrying out the proposed transactions, thus mitigating the risk that only one party would perform the agreed-upon exchange.

On the first step of the *Mayo* test, the *Alice* Court found that the patents were directed to the idea of intermediated settlement, which was an abstract idea. Thus, the Court moved to the second step of the test, and asked whether the claims contained an "inventive concept" that was "sufficient to transform the claimed abstract idea into a patent-eligible application."

The *Alice* Court ultimately concluded that the patents' claims did not contain such an "inventive concept," and while the opinion did not describe the type of disclosures that *would* be sufficient to constitute an inventive concept, it did give clear examples of the types of disclosures that were *not* sufficient.

First, *Alice* followed the *Mayo* Court in holding that "[s]tating an abstract idea while adding the words 'apply it' is not enough for patent eligibility." 134 S.Ct. at 2358 (internal citation and quotations omitted). Also insufficient is "limiting the use of an abstract idea to a particular technological environment." *Id.*

■ Combining those two principles, the *Alice* Court held that "stating an abstract idea while adding the words 'apply it with a computer' simply combines those two steps, with the same deficient result." 134 S.Ct. at 2358. Thus, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* The Court noted that such a conclusion "accords with the preemption concern that undergirds our § 101 jurisprudence." *Id.* In other words, simply adding a "wholly generic computer implementation" did not meaningfully limit the scope of a patent, and in practice, would lead to the same result as patenting an abstract idea itself.

In reaching its conclusion, the *Alice* Court demonstrated the shortcomings of the "machine-or-transformation" test. While a computer (even a generic one) is undoubtedly a "machine," its inclusion in a patent claim cannot be sufficient for § 101 purposes, as it would allow an applicant to "claim any principle of the physical or social sciences by reciting a computer system configured to implement the relevant concept," thereby "eviscerating the rule that laws of nature, natural phenomena, and abstract ideas are not patentable." 134 S.Ct. at 2359 (internal citations omitted).

■ In a similar vein, the *Alice* Court held that the inclusion of "well-understood, routine, conventional activities previously known to the industry" did not suffice as the "inventive concept" necessary for patentability. Just as the addition of a generic computer to an abstract idea would not place meaningful limits on a patent's scope, the addition of generic computer functions would similarly fail to provide any such limits.

In sum, the *Alice* Court found that the "claims at issue amount to nothing significantly more than an instruction to apply

the abstract idea of intermediated settlement using some unspecified, generic computer." 134 S.Ct. at 2360. Under previous precedent, "that is not *'enough'* to transform an abstract idea into a patent-eligible invention." *Id.* (emphasis in original).

By clarifying that the addition of a generic computer was not enough for § 101 patentability, *Alice* has had a significant impact on software patents. In *Alice's* wake, the Federal Circuit and numerous district courts have wrestled with the issue of whether various software patents disclose the "inventive concept" required for patentability. Having reviewed the cases cited in the parties' papers, the court finds two post–*Alice* Federal Circuit cases particularly useful for discerning the boundaries between a software patent that merely discloses an unpatentable abstract idea and one that discloses a patentable invention.

The first of these cases, *Ultramercial, Inc. v. Hulu, LLC,* involved a patent covering a method for monetizing and distributing copyrighted products over the Internet. 772 F.3d 709 (Fed.Cir.2014). Specifically, the claimed method allowed a user to view copyrighted media (such as a television show) over the Internet, for no charge, in exchange for viewing an advertisement.

The *Ultramercial* patentee maintained that its patent covered a "specific method of advertising and content distribution that was previously unknown and never employed on the Internet before," and thus was not the type of "well-known" and "routine" activity rejected in *Alice.* 772 F.3d at 714. The patentee further argued that its claimed invention "extends beyond generic computer implementation of [an] abstract idea." *Id.* In support of its argument, the patentee pointed to the detailed eleven-step process disclosed in the patent:

(1) receiving the copyrighted media from a content provider, (2) selecting an ad, (3) offering the media on the Internet, (4) restricting public access to the media, (5) offering the media to the customer in exchange for watching the selected ad, (6) receiving a request to view the ad from a user, (7) facilitating display of the ad, (8) allowing the consumer to access the media, (9) allowing the consumer access to the media if the ad is interactive, (10) updating the activity log, and (11) receiving payment from the ad sponsor.

*Id.* at 714–15.

The *Ultramercial* court agreed that these steps added "a degree of particularity," but ultimately found that they still described "only the abstract idea of showing an advertisement before delivering free content." 772 F.3d at 715. Thus, under the first step of *Alice,* the patent was indeed directed towards an abstract idea.

The *Ultramercial* court then asked whether the claims "did significantly more than simply describe that abstract method," i.e., whether the claims disclosed an "inventive concept." It cited *Alice* and *Mayo's* teaching that a claim that "recites an abstract idea must include additional features to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea," and that the "additional features" must be "more than well-understood, routine, conventional activity." 772 F.3d at 715 (internal citations omitted).

Applying those teachings, the *Ultramercial* court found the patent invalid, as "the claims simply instruct the practitioner to implement the abstract idea with routine, conventional activity." 772 F.3d at 715. Regardless of whether the eleven recited steps were viewed individually or as a whole, they did not "transform the nature of the claim into patent-eligible subject

matter." Instead, the "claims' sequence of steps comprises only conventional steps, specified at a high level of generality, which is insufficient to supply an inventive concept." *Id.* at 716. While the court acknowledged that "some of the eleven steps were not previously employed in this art," it held that was "not enough—standing alone—to confer patent eligibility." *Id.*

In the second Federal Circuit case, *DDR Holdings, LLC v. Hotels.com, L.P.*, the court upheld the patentability of a software patent under *Alice.* 773 F.3d 1245 (Fed.Cir.2014). The *DDR* patent sought to solve a problem that arose when website visitors clicked on an advertisement on a "host website." The user would be automatically transported away from the host website and taken to the advertiser's website, which meant that the host website lost that website visitor, and that the user's experience was disrupted, making them less likely to purchase a product from the advertiser. The patent disclosed a method for generating a "hybrid website"—which replicated the "look and feel" of the host website, but contained the relevant product information for the advertiser's website, and even enabled the web user to purchase products from the advertiser without needing to visit the advertiser's website.

The *DDR* court did not expressly state that it found that the patent was directed to an abstract idea (though the opinion suggests as much). Regardless, *DDR* moved to step two of the *Alice* analysis, and found that there was an inventive concept, as the claims "do not attempt to preempt every application of the idea of increasing sales by making two web pages look the same," and instead recited a "specific way to automate the creation of a composite web page." 773 F.3d at 1259. The *DDR* court expressly distinguished *Ultramercial*, holding that the *DDR* pat-

ent's claims were "different enough from those in *Ultramercial* because they do not broadly and generically claim 'use of the Internet' to perform an abstract business practice (with insignificant added activity)." *Id.* at 1258. Instead, by disclosing a "specific way" to create composite web pages, the patent constituted "more than a drafting effort designed to monopolize the abstract idea," and thus, contained the required "inventive concept" required for patentability under § 101. *Id.* at 1259 (citing *Alice,* 134 S.Ct. at 2357).

What stands out from the *Alice/Mayo* line of cases is the courts' focus on preemption. as the key concern underlying section § 101 analyses. This theme of preemption runs throughout *Alice* and *Mayo,* and is especially apparent when viewing *Ultramercial* and *DDR* together. Notably, though the courts in both *Ultramercial* and *DDR* appear to have concluded that the patents at issue were directed towards abstract ideas, the *DDR* court found that the patent disclosed an "inventive concept," whereas the *Ultramercial* court found otherwise. In so finding, the *DDR* court did not focus on the novelty of the disclosed invention, but instead hinged its ruling on the fact that the claims did "not attempt to preempt every application of the idea," and instead covered only one "specific way to automate the creation of a composite web page." 773 F.3d at 1259. In contrast, the patent at issue in *Ultramercial* appeared to be a "drafting effort designed to monopolize the abstract idea itself." 772 F.3d at 716.

■ In other words, the hallmark of the "inventive concept" test is whether the patentee has added something to the claims to limit their scope, so that they do not monopolize the entire abstract idea to which the claims are directed. This accords with the purpose of section 101's carve-outs for abstract ideas, laws of na-

ture, and physical phenomena, which is to "ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 134 S.Ct. at 2355. In articulating the "inventive concept" requirement, the *Mayo* Court heeded prior Court cases which "warn us against upholding patents that claim processes that too broadly preempt the use of" an ineligible concept, such as an abstract idea. *Mayo*, 132 S.Ct. at 1294. In that sense, the search for an "inventive concept" can also be thought of as a search for a "limiting concept"—something that restricts the scope of the claims, ensuring that the patent does not cover the entirety of the abstract idea.

This understanding of an "inventive concept" as akin to a "limiting concept" is in line with the courts' rejection of the patents at issue in *Mayo* and *Alice*. In *Mayo*, the Court held that the addition of "well-understood, routine, conventional activity already engaged in by the scientific community" did not serve to provide the required "inventive concept." 132 S.Ct. at 1298. In other words, by disclosing only run-of-the-mill steps, the claims did not meaningfully restrict the scope of the patent. Similarly, in *Alice*, the Court held that merely stating an abstract idea and adding the words "apply it with a computer" did not suffice as an "inventive concept," because a "wholly generic computer implementation is not generally the sort of 'additional feature' that provides any practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself." 134 S.Ct. at 2358. If the *Alice* patentee had added something more to the claims, beyond the mere use of a computer, to ensure that the claims covered a specific application of the abstract idea (rather than the idea itself), it could have been patent-eligible under § 101.

Notably, the search for an "inventive concept" places no importance on the novelty of the abstract idea. A novel abstract idea is still an abstract idea, and is therefore unpatentable. Just as "Einstein could not patent his celebrated law that $E = mc^2$," despite it being a new discovery, an inventor cannot patent any new abstract idea that he discovers. *See Diamond*, 450 U.S. at 185, 190, 101 S.Ct. 1048 ("The question therefore of whether a particular invention is novel is wholly apart from whether the invention falls into a category of statutory subject matter.").

Thus, at the second step of the *Alice/Mayo* test, after a court has determined that the patent is directed towards an abstract idea, the key question is whether the claims add something to the abstract idea so that the patent covers a specific application of the abstract idea, rather than the idea itself. *See, e.g., Accenture Global Services, GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed.Cir.2013) (if a patent is directed at an abstract idea, the court must then "determine whether additional substantive limitations narrow, confine, or otherwise tie down the claim so that, in practical terms, it does not cover the full abstract idea itself."). This understanding of the second *Alice/Mayo* step is reflected in the *DDR* decision, which upheld a patented process only after finding that "the claims at issue do not attempt to preempt every application of the idea" embodied in the patents, and instead were limited to "a specific way" of accomplishing the general concept. *DDR*, 773 F.3d at 1259.

Of the district court cases decided post-*Alice*, the discussion of the "inventive concept" in *Caltech v. Hughes Communications* is particularly helpful. 59 F.Supp.3d 974 (C.D.Cal.2014). *Caltech* is also one of the few post-*Alice* cases to uphold the validity of a software patent, making it

especially useful for discerning the boundaries of § 101.

*Caltech* involved patents covering processes for the encoding and decoding of data for error correction. At the first *Alice/Mayo* step, the court found that the patents were indeed directed to an abstract idea. The court then observed that, if the patent sought to claim those essential concepts, without any limiting principle, it would "threaten to preempt the entire field of error correction." 59 F.Supp.3d at 993. Thus, as part of the second *Alice* step, the *Caltech* court sought to determine whether the claims "contain meaningful limitations that represent sufficiently inventive concepts." *Id.* at 994.

Ultimately, the *Caltech* court did find an inventive concept, noting that the patents contained steps that were not "necessary or obvious tools for achieving error correction," and thus "ensure that the claims do not preempt the field of error correction." 59 F.Supp.3d at 994. By disclosing "unconventional" techniques for error correction that were "narrowly defined," "tied to a specific error correction process," and "not necessary or obvious tools for achieving error correction," the patents did not preempt the field of error correction, as any conventional, well-understood, and routine methods of error correction remained outside of the patents' boundaries. *Id.* at 994–996.

The determination of whether an asserted claim is invalid for lack of subject matter patentability under § 101 is a question of law. *See In re Comiskey,* 554 F.3d 967, 975 (Fed.Cir.2009). A patent is presumed to be valid by statute, 35 U.S.C. § 282; therefore, a patent challenger bears the burden of proving invalidity by clear and convincing evidence. *See Pfizer, Inc. v. Apotex, Inc.,* 480 F.3d 1348, 1359 (Fed.Cir.2007). This standard of proof applies equally at summary judgment. *See National Presto Indus. v. West Bend Co.,* 76 F.3d 1185, 1189 (Fed.Cir. 1996).

### B. Legal Analysis

With the above principles in mind, the court must now apply the two-part *Alice/Mayo* test to the five patents at issue in this suit. As mentioned above, the court finds it helpful to consider the patents as part of three different groups: the Category patents, the Viewing History patents, and the Bookmarking patent. The court will address each group in turn.

#### 1. Category patents ('929 patent and '962 patent)

##### a. '929 patent

The '929 patent covers the use of "combination categories" to organize various programs—in other words, instead of using only "simple" categories such as "comedy" or "drama" to classify movies, this patent covers categorizing programs using "combination categories," such as "sports dramas," or "romantic comedies," or even "critically-acclaimed foreign animated movies featuring strong female leads and set in the 1950s."

In its motion, Netflix cites claim 11 as representative of the '929 patent, and Rovi's brief primarily discusses claim 11 and claim 14. Claim 11 reads as follows:

A system for locating programs of interest to a user, the system comprising:

> a receiver that receives a plurality of program listings, wherein at least one of the program listings is associated with two or more simple categories; and
>
> a processor that generates at least one combination category by:
> identifying the two or more simple categories associated with the at least one program listing; and
> combining at least a subset of the identified simple categories associated

with the at least one program listing into the at least one combination category, wherein the combination category comprises more than one of the identified simple categories.

Claim 14 is dependent on claim 13, which is dependent on claim 12, which is in turn dependent on claim 11. Claims 12, 13, and 14 read as follows:

12. The system of claim 11, wherein the processor is configured to combine at least a subset of the identified simple categories associated with the at least one program listing into the at least one combination category by:

combining the identified simple categories into groups of two or more of the identified simple categories; and determining, for each of the groups of simple categories, whether the respective group is contained within a list of supported categories;

wherein the at least one combination category comprises one of the groups of simple categories contained within the list of supported categories.

13. The system of claim 12, wherein the processor is further configured to:

automatically identify a plurality of simple categories that are of high interest to the user; and

generate the list of supported categories from the plurality of simple categories that are of high interest to the user.

14. The system of claim 13, wherein the processor is configured to automatically identify a plurality of simple categories that are of high interest to the user by identifying a first simple category that received more user selections than a second simple category.

 Addressing the first *Alice/Mayo* step, Netflix describes these claims as being directed to the abstract idea of "categorizing shows using combination catego-

ries," and Rovi does not meaningfully challenge this assertion in its opposition, instead arguing that the use of combination categories was unknown in the prior art at the time. *See* Dkt. 121 at 22 (describing the '929 patent's "critical aspect" as "generating 'combination categories' from program listings associated with simple categories, a problem *which the prior art 17 years ago had not solved.*") (emphasis in original). Rovi further argues that the novelty of combination categories makes the '929 patent "fundamentally different from the abstract, longstanding business practice" at issue in *Alice.* Dkt. 121 at 23.

However, the issue of whether combination categories were known in the prior art does not say anything about whether the claims are directed to an abstract idea—and it seems apparent that the idea of using composite categories to define shows is indeed abstract, even if it was wholly novel at the time of filing. The fact that dependent claims 13 and 14 add the element of generating recommendations using those combination categories does not render the claims any less abstract.

 Thus, the court moves to step two of the *Alice/Mayo* test, and asks whether the '929 patent discloses an inventive concept. Rovi analogizes this case to *Caltech,* in which the court found that the patent disclosed "a unique computing solution that addresses a unique computing problem." However, Rovi seems to ignore that the *Caltech* court focused on the narrow nature of the claimed solution in finding it patentable—emphasizing that the claims contained "meaningful limitations," "ensur[ing] that the claims do not preempt the field of error correction." *Caltech,* 59 F.Supp.3d at 994.

Here, the court is unable to find any such "meaningful limitations." Rovi cites testimony from its expert stating that claim 11 recites the following "unconven-

tional steps," which purportedly distinguish this case from *Alice* and *Ultramercial*:

> (1) generating at least one combination category by: identifying the two or more simple categories associated with the at least one program listing, (2) combining at least a subset of the identified simple categories associated with the at least one program listing into the at least one combination category, and (3) wherein the combination category comprises more than one of the identified simple categories.

Dkt. 121 at 24 (citing Dkt. 121–4, ¶ 83).

The court fails to see how these so-called "unconventional" steps—whether considered individually or as part of an ordered combination—are anything more than restating the abstract idea with the instruction to "apply it." Rovi fails to show how its claimed method would be different from a "conventional" method of using combination categories, and instead proceeds on the assumption that offering expert testimony invoking the word "unconventional" is enough. Essentially, Rovi seeks to patent the idea of using combination categories, limited only by the use of a "processor" and a "receiver," both of which are generic computer components of the type rejected in *Alice*.

In its opposition, Rovi takes issue with Netflix's identification of claim 11 as representative, and argues that other dependent claims contain inventive concepts:

> For example, claim 12 requires "supported categories," claim 13 requires "a plurality of simple categories that are of high interest to the user," claim 14 requires a "first simple category that received more user selections than a second simple category," claim 16 requires "associated metadata," claim 17 requires a combination category assigned to a

"program listing," [and] claims 18, 19, and 20 require specific hardware integral to the claimed method, like presenting the categories "on the display."

Dkt. 121 at 24.

While these dependent claims may indeed contain additional elements, Rovi has not shown how any of those elements provide meaningful limitations on the abstract idea of using combination categories. At best, claims 18, 19, and 20 require a type of machine, but a "display" is even more generic than the "general purpose computer" rejected in *Alice*.

The '929 patent may well disclose an idea that was unconventional at the time of the patent's filing. However, an unconventional abstract idea is still an unpatentable abstract idea. Rovi must do more than merely show an unconventional idea, it must show an unconventional *embodiment* of that idea. Otherwise, the patent would preempt all embodiments of the abstract idea—precisely the result that the *Alice/Mayo* test was designed to safeguard against. In other words, whereas the *DDR* court found that "the claims at issue do not attempt to preempt every application of the idea" at issue, this court finds that the '929 patent would indeed preempt every application of the idea of using combination categories to categorize programs. As a result, the court finds that the '929 patent fails to disclose an inventive concept, and is thus invalid under § 101.

#### b. '962 patent

The '962 patent covers the use of "selectable categories" to allow users to filter their search results when searching for television shows. In other words, rather than just searching for shows by title, users may also use categories to refine their search results. Both parties primarily cite claim 1 as a representative example:[1]

---

1. In a footnote, Rovi takes issue with the identification of claim 1 as representative,

A method for searching for shows comprising:

> providing a search engine application;
> receiving one or more characters in said search engine application, wherein said one or more characters are entered in an alphanumeric input area;
> matching said characters using said search engine application to one or more database entries;
> providing results corresponding to said database entries in a results listing, wherein said results comprise one or more show listings and one or more selectable categories of shows;
> receiving a user selection from said results listing of one of said selectable categories;
> providing at least one additional show listing corresponding to said selected selectable category in response to the user selection of said selected selectable category; and
> enabling a user to perform an action by selecting one of said at least one additional show listings.

■ Netflix argues that the '962 patent is directed to an abstract idea, and again, Rovi does not meaningfully challenge this argument. In fact, Rovi admits that "the claimed steps are directed to the critical feature of enabling users to refine their searches based on selectable categories." Dkt. 121 at 19. While Rovi argues that this "critical feature ... differ[s] in a fun-

damental respect from the abstract methods of using a computer merely to calculate a pre-computer age mathematical problem," and instead "recites a technological solution to a problem of refining user searches that arose in the realm of interactive program guides," those arguments, at best, establish the novelty of the abstract idea. Overall, the court finds that the '962 patent is indeed directed to the abstract idea of filtering search results using selectable categories.

■ Thus, the court moves to the second *Alice/Mayo* step, and asks whether the '962 patent discloses an inventive concept. Rovi first argues that its own proposed construction ties the "search engine application" to "hardware, software, and/or firmware which receives search requests and interfaces with one or more databases to respond to search requests."

It appears that Rovi is trying to establish patentability according to the pre-*Alice* (and *pre-Bilski*) "machine or transformation test," whereby claims were held to be patent-eligible if they were tied to a particular machine or apparatus (or if they transformed a particular article into something different). However, as discussed above, the Supreme Court's *Bilski* decision held that the "machine or transformation" test was not the definitive test for patentability. 561 U.S. at 603, 130 S.Ct. 3218. Thus, even if the '962 patent were tied to a particular machine, that still would not render the claims patentable. Moreover,

arguing that "each asserted claim requires distinctive features of the claimed search engine application. Dkt. 121 at 19, n. 15. For example, Rovi cites the "on-demand programming" requirement of claims 3 and 16; the "titles of shows" requirement of claims 5 and 18; the requirement of selection of characters from entries in an alphanumeric input area of claims 6 and 19; the "keyword search field" requirement of claims 9 and 23; the structural requirements of claim 14, including an "input device," an "output device," a "display

of results listings," and a "display of additional show listing;" and claim 27's requirement of a "computer readable medium ... having computer readable program code" of claim 27. These claims are substantially similar to claim 1, with the additional elements of note being the structures disclosed in claims 14 and 27. However, the disclosed "input device," "output device," "display[s]," and "computer readable medium" are no more particular than the "general purpose computer" that was rejected in *Alice*.

the court has not adopted Rovi's proposed construction, so there is no "machine" disclosed in claim 1, and the only "machines" disclosed in the other claims ( the "input device," "output device," and "display[s]" of claim 14, and the "computer readable medium" of claim 27) are no more particular than the "general purpose computer" that was rejected in *Alice*.[2]

Rovi then tries another argument, arguing that the computer-implemented steps do not operate in a normal, expected manner in the following ways: (1) providing search results that comprise show listings and selectable categories, (2) providing at least one additional show corresponding to each selectable category, (3) enabling a user to select shows, (4) enabling a user to watch selected shows, and (5) enabling a user to obtain additional information about the shows. *See* Dkt. 121 at 21. This recitation of steps strikes the court as similar to that in *Ultramercial*, where the patentee pointed to its eleven-step process as proof that the claims disclosed "a specific method of advertising and content distribution that was previously unknown and never employed on the Internet before." 772 F.3d at 714. The *Ultramercial* court rejected that argument, first finding that "each of those eleven steps merely instructs the practitioner to implement the abstract idea with routine, conventional activities," and then concluding that although "some of the eleven steps were not previously employed in this art," that was "not enough—standing alone—to confer patent eligibility upon the claims at issue." *Id.* at 716.

The court finds that the rationale of *Ultramercial* applies here with equal force. Rovi's five-step process represents no more than an instruction to "implement the abstract idea" of using selectable cate-

gories to filter search results with "routine, conventional activity." While the steps add a level of detail, they constitute no more than simply re-stating the abstract idea with the instruction to "apply it." Whether considered as individual steps or as an ordered combination, the court finds no inventive concept that would prevent Rovi's patent from preempting the entire abstract idea of using selectable categories to filter search results.

Finally, Rovi argues that the claims "transform characters into selectable categories." Specifically, Rovi argues that the claims disclose the transformation of alpha-numeric categories into "results comprising one or more show listings and one or more selectable categories of shows." This argument appears to imply that any patent which involves using text to represent any sort of selectable object (a video file, an audio file, a web hyperlink, etc.) involves a "transformation" that brings the patents within § 101's boundaries.

Whereas Rovi had previously argued under the "machine" prong of the "machine or transformation" test, it now argues under the "transformation" prong. For support, Rovi relies on a district court case where the invention disclosed the use of a "tag" that was appended to credit card data as part of a verification process. *Card Verification Solutions, LLC v. Citigroup, Inc.,* 2014 WL 4922524 (N.D.Ill. Sept. 29, 2014). Even putting aside the fact that *Card Verification* is a district court case, and not binding on this court, there are at least two points of distinction that undercut the opinion's persuasive value.

■ First, *Card Verification* was decided on a motion to dismiss, and the court

2. Further, even if the court had adopted Rovi's proposed construction, "hardware, software, and/or firmware" is even broader than the "general purpose computer" rejected in *Alice*.

simply left open the question of whether the claims were patentable under § 101. Second, the *Card Verification* court acknowledged that "typically, transforming data from one form to another does not qualify as the kind of transformation regarded as an important indicator of patent eligibility," but found that the invention went beyond "manipulating, reorganizing, or collecting data by actually adding a new subset of numbers or characters to the data, thereby fundamentally altering the original confidential information." 2014 WL 4922524, at *5.

In contrast, this case involves the mere "reorganization" of data using categories, there is no "fundamental alteration" to the information itself. Moreover, the *Card Verification* invention did not cover all credit card verification systems, and instead was limited to applications that involved appending a "tag." This finding echoes *Caltech*, where the court specifically found that the claimed method "does not capture many forms" of implementing the abstract idea of error correction, and thus, the claims did "not preempt the field of error correction but capture[d] only one effective form of error correction." 59 F.Supp.3d at 996. In contrast, the '962 patent contains no such limiting principle, and the claims seek to capture all uses of selectable categories to filter search results.

Accordingly, the court finds that the '962 patent fails to disclose an inventive concept, and thus is invalid under § 101.

**3.** In a footnote, Rovi argues that claim 1 is not representative of the '762 patent, and argues that the other claims "recite distinctive applications of the claimed client-server architecture." Dkt. 121 at 12, n. 13. Rovi points to the step of "collecting program ratings information" of claims 6 and 17; the "user preference information" of claim 15; and the "additional physical structure" of

2. Viewing History patents ('762 patent and '709 patent)

a. '762 patent

The '762 patent claims a system and method for visually distinguishing watched programs from unwatched programs and making viewing recommendations based on a user's viewing history. The parties use claim 1 and claim 13 as illustrative examples:[3]

1. A method for use in a client-server interactive television program guide system for tracking a user's viewing history, comprising:

tracking a user's viewing history;

storing the user's viewing history on a program guide server;

finding programs with the program guide server that are consistent with the user's viewing history;

determining, with the program guide server, whether the programs found by the program guide server were not previously viewed on user television equipment; and

displaying, with a program guide client implemented on the user television equipment, a display of program titles, wherein the display:

includes the programs found by the program guide server, wherein some of the programs have been previously viewed on the user television equipment and some of the programs have not been previously viewed on the user television equipment; and

claim 13, which includes "user television equipment" and a "communications path." These claims are substantially similar to claim 1, and to the extent that claim 13 includes additional physical structures, a "communications path" is no more particular than the "general purpose computer" that was rejected in *Alice*, and "user television equipment" is fully addressed above.

visually distinguishes the programs determined by the program guide server to have been previously viewed from the programs that have not been previously viewed.

13. A client-server interactive television program guide system for tracking a user's viewing history, comprising:

user television equipment on which an interactive television program guide client is implemented, wherein the interactive television program guide client is programmed to provide an individual user's viewing history information to a program guide server over a communications path, wherein:

the program guide server is programmed to find programs based on the individual user's viewing history information, determine whether the programs found by the program guide server have been previously viewed on user television equipment, and to indicate the programs to the interactive television program guide client over the communications path; and

the interactive television program guide client is further programmed to display, on the user television equipment, a display of program titles, wherein the display:

includes the programs found by the program guide server, wherein some of the programs have been previously viewed on the user television equipment and some of the programs have not been previously viewed on the user television equipment; and

visually distinguishes the programs determined by the program guide server to have been previously viewed from the programs that have not been previously viewed.

Netflix argues that this patent is directed to an abstract idea, while Rovi argues that the patent is limited to a "unique program guide-program server ar-

chitecture integral to the claimed invention." Rovi also emphasizes the fact that the ITC found that the '762 patent (and the '709 patent, which shares the same specification) does not embody an abstract idea. However, the ITC decision was issued before Alice, and even putting that aside, the decision contains no analysis that the court finds persuasive, and instead just contains a rote recitation that the patents cover more than just abstract ideas. Also, even if the claims were limited to a specific architecture, such a limitation would factor into the second step of Alice, not the first step. Overall, the court does find that the '762 patent is directed to the abstract idea of using a user's viewing history to visually distinguish watched programs from unwatched programs and to make recommendations.

On the second step of Alice, Rovi again argues that the claims are tied to a particular machine. Interestingly, while the claims do appear to be limited to "user television equipment," Rovi does not emphasize that limitation. Instead, in its opposition, Rovi offers the conclusory assertion that the program guide server/client are "unique and particular," without explaining how a "program guide server/client" system is any different from a generic server/client system that happens to be used for displaying program guides. A generic system component does not become any less generic through the addition of a functional description. As an example, if the claims in Alice had referred to a "settlement risk-mitigating computer," rather than just a generic computer, it would not make the computer any more "unique" or "particular."

However, while the terms "program guide server" and "program guide client" do not limit the claims to anything more particular than a general purpose computer, the term "user television equipment" presents a distinct question. Interesting-

ly, Rovi's brief does not discuss the "user television equipment" limitation in any detail, and simply cites to the ITC's conclusion that "[u]ser television equipment implementing a program guide client is a 'particular machine' integral to the client-server system of the '762 patent." Dkt. 121 at 13 (citing ITC record at ID 129). Because the ITC decision does not present the reasoning behind its conclusion, the court does not consider it particularly persuasive, and rather than relying on the ITC's conclusion, the court will address the issue anew.

Essentially, the question before the court is whether "user television equipment" is closer to the "general purpose computer" of *Alice* (which was held not to be sufficiently "particular" for § 101 purposes) or closer to the GPS receiver of *SiRF Tech., Inc. v. Int'l Trade Commission* (which was held to be sufficiently "particular" for § 101 purposes). *See Alice,* 134 S.Ct. at 2358; *SiRF,* 601 F.3d 1319, 1332–33 (Fed.Cir.2010). Although *SiRF* was decided before both *Alice* and *Mayo,* and thus does not address the two-part test, the court still finds *SiRF* somewhat relevant in light of the Supreme Court's holding that the "machine or transformation" test can be a "useful and important clue" regarding patentability.

As mentioned above, Rovi's brief does not present any argument equating "user television equipment" to *SiRF's* GPS receiver. As a result, at the hearing, the court asked both parties for further argument on the issue. Rovi offered only the conclusory assertion that the claims are "very much like the GPS receiver in *SiRF*" because "the systems wouldn't function without the GPS receiver in *SiRF*" and, similarly, the system here "wouldn't function without the server and client [and] the user television equipment that exists in the '762 patent." Dkt. 151 at 93. However, it cannot be enough to simply show that the

system "would not function" without the particular machine. If it were, then the *Alice* Court would have upheld the patents in that case, because the claimed method would not have functioned without the cited general purpose computer. *SiRF,* to the extent it remains good law in light of *Alice,* requires more than just a showing that the claimed method "would not function" without a recited machine.

In *SiRF,* the court held that "[i]n order for the addition of a machine to impose a meaningful limit on the scope of a claim, it must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly." 601 F.3d at 1333. The court also emphasized that "there is no evidence here that the calculations here can be performed entirely in the human mind," and thus, "the use of a GPS receiver is essential to the operation of the claimed methods." *Id.*

In the present case, the human mind is certainly capable of distinguishing between watched and unwatched programs, and making recommendations based on a user's viewing history. The use of television equipment simply enables those steps to be visually represented, and at best, is "an obvious mechanism for permitting a solution to be achieved more quickly." In fact, if the user has watched only a few programs, the use of television equipment rather than the human mind may be no quicker at all. Overall, the court finds that "user television equipment" is not analogous to the GPS receiver of *SiRF,* and thus, is not sufficiently limiting for purposes of section 101.

Beyond the "particular machine" argument, Rovi separately argues that the claims "do not operate in a normal, expected manner," as they include the non-generic steps of: (1) determining on the server whether the programs have been

previously viewed, (2) sending a signal to the client indicating the previously-viewed programs, and (3) visually distinguishing the previously-watched programs. *See* Dkt. 121 at 13–14 (citing Dkt. 1211, ¶ 103). The court fails to see how these steps—whether considered individually or as an ordered combination—are anything other than the type of routine, conventional, well-understood steps that were rejected in *Alice*, *Mayo*, and *Ultramercial*. Thus, the court finds that the '762 patent fails to disclose an inventive concept that adds something to the claims other than the abstract idea itself, and thus, is invalid under § 101.

b. '709 patent

The '709 patent, which shares a common specification with the '762 patent, claims a system and method for providing personal recommendations based on a user's viewing history. The parties use claims 13 and 14 as illustrative examples:

13. A method for use in an interactive program guide system for providing a customized viewing experience to a user, comprising:

generating a viewing history database comprising program listings and associated program criteria;

determining at least one of the associated program criteria from the viewing history database that meets a user preference profile;

determining from a program listing database a set of programs not yet watched;

applying the at least one of the associated program criteria to the set of programs not yet watched to generate at least one personal viewing recommendation; and

providing the personal viewing recommendation to a user.

14. The method defined in claim 13 wherein generating a viewing history database comprises storing the program listings and the associated program criteria for at least one of:

programs that the user has watched;

programs for which the user has scheduled reminders;

programs for which the user has scheduled for recording;

programs for which the user has searched; and

programs for which the user has ordered.

Netflix argues that the claims are directed to an abstract idea, and Rovi argues that the concept was novel at the time, as the patent "recited a technological solution to a specific problem arising in interactive television guides of generating personal viewing recommendations based on programs not yet watched regardless of which device the user employs." Again, while Rovi may be correct that the claims are directed to a *novel* abstract idea, they nonetheless are directed to an abstract idea, namely, the abstract idea of generating viewing recommendations.

Rovi argues that the claims are tied to particular machines, but unlike the '762 patent, there is not even a limitation to "television equipment" here, only a "viewing history database" and a "program listing database."[4] A "database" is no dif-

---

4. Rovi also cites, in a footnote, other claims that purportedly recite "distinctive applications of the program guide-program server architecture to generate personal viewing recommendations." *See* Dkt. 121 at 16, n. 14. These purported "distinctive applications" are substantially similar to the methods of claims 13 and 14, with the additional ele-

ments of note being the "additional physical structure" in claim 17. However, the disclosed "user equipment on which an interactive program guide client is implemented," "program guide server," "first database," "second database," "processing circuitry," and "communications path" are no more par-

ferent from a generic computer, and as before, the addition of functional descriptors does not turn a generic database into something more particular. While the ITC concluded that the "database in the interactive program guide system is a particular type of machine," given the intervening *Alice* opinion, the court finds the ITC's conclusion of limited value. Accordingly, the court finds that the '709 patent claims fail to tie the method to a particular machine that would sufficiently limit to the scope of the patent to something narrower than an abstract idea.

■ Rovi then argues that the claimed steps "do not operate in a normal, expected manner," and cites to expert testimony stating that the step of "determining at least one of the associated program criteria from the viewing history database that meets a user preference profile" is not a routine or conventional activity for a computer database. Dkt. 121 at 17 (citing Dkt. 121–1, ¶ 126). Rovi also cites to a district court case from the District of Delaware, where "tailoring the delivery of information to a specific user" was found patentable under *Alice. Intellectual Ventures v. Traders Trust*, 76 F.Supp.3d 536, 548, 2014 WL 7215193 at *9 (D.Del.2014).

In *Intellectual Ventures*, the patents were based on the idea of "providing a customized web page with content based on the user's profile and website navigation history." 76 F.Supp.3d at 548, 2014 WL 7215193, at *9. The court followed the Federal Circuit's decision in *DDR* (mentioned above) and found the invention patentable, but specifically pointed out

that the claims "do not preempt all applications of providing customized web pages, as they recite a specific method of customizing web pages based on user data." *Id.*

In contrast to *Intellectual Ventures*, the '709 patent in this case does not disclose a "specific method" of generating viewing recommendations, as the claims seek to capture virtually *all* methods of generating recommendations. Neither the claims themselves nor Rovi's brief contain any meaningful disclosure of *how* the recommendations are generated—based on what programs viewers with similar preferences have liked, or based on the content providers' own determination of what programs are similar, etc. In short, unlike *Intellectual Ventures*, and unlike *Caltech*, these claims do seek to preempt all applications of the abstract idea. Moreover, the court finds that the claimed steps—whether considered individually or as part of an ordered combination—do not go beyond routine, conventional means of generating viewing recommendations. Thus, the court finds that no inventive concept is disclosed, and that the '709 patent is invalid under § 101.

3. Bookmarking patent (the '906 patent)

The '906 patent claims a method of creating a "bookmark" to allow users to start watching a program on one device, then resume the program at the same point on a different type of device. Rovi's brief primarily cites claims 1 and 6 as illustrative of the claims.[5] Claim 1 reads as follows:

ticular than the "general purpose computer" that was rejected in *Alice.*

**5.** In a footnote, Rovi cites other claims that purportedly "recite[ ] distinctive applications" of the claimed method. Rovi points to the step of "identifying device properties . . . prior to commencing delivery of the media" in claim 2; the requirement of storing the media and delivering it to one or a plurality of media-on-demand servers in claims 3, 6, and 8; and the step of "interrupting said delivery of said media" in claims 10 and 11. Dkt. 121 at 7, n. 9. The court finds these claims to be substantially similar to claims 1 and 6, and linked to the same abstract idea.

A method for providing configurable access to media in a media-on-demand system comprising the steps of:

delivering the media to a first client device through a first communications link, wherein the media is configured in a format compatible with identified device properties of said first client device and said first client device is associated with a first user;

recording a bookmark specifying a position in the media; and

delivering the media to a second client device through a second communications link, said delivery to said second client device beginning at said position specified by said recorded bookmark, wherein the media is configured in a format compatible with identified device properties of said second client device and said second client device also is associated with said first user.

Claim 6 is dependent on claim 3, which is dependent on claim 2, which is in turn dependent on claim 1. Claims 2, 3, and 6 read as follows:

2. The method according to claim 1, further comprising the steps of:

identifying device properties for each of said first and second client devices, device properties of said first client device being identified prior to commencing delivery of the media to said first client device and device properties of said second client device being identified prior to commencing delivery of the media to said second client device.

3. The method according to claim 2, wherein the media is stored in a media-on-demand server (MODS) and delivered to said first and said second client devices via said first and said second communications link respectively.

6. The method according claim 3, further comprising:

storing the media in selected ones of a plurality of media-on-demand servers, each MODS in said plurality of media-on-demand servers storing the media in at least one format compatible with a selected device type;

selecting a MODS for delivering the media to said first client device, said selected MODS having stored thereon the media in a format compatible with said first client device; and

delivering from said selected MODS the media in a format compatible with said first client device.

■ Netflix argues that the '906 patent claims are directed to the abstract idea of bookmarking across devices, while Rovi focuses on the fact that the process was novel at the time of invention. As discussed above, whether the process was novel does not factor in the "abstract" analysis. A novel abstract idea is still an abstract idea.

When discussing the '906 patent at the hearing, the court specifically asked Rovi's counsel: "What makes it not abstract?" Dkt. 151 at 64. Counsel responded by pointing to the "media-on-demand server system" and the "client-server architecture," but as the *Alice* Court held, the mere presence of a computer does not preclude a finding that the patent is directed to an abstract idea. Just as the *Alice* Court found that the claims were directed to "the abstract idea of intermediated settlement," despite the presence of a computer, the court finds that the '906 patent claims are directed to the abstract idea of bookmarking media files across devices, despite the presence of a server and a client.

■ Moving to the second step's search for an inventive concept, Rovi's primary arguments are based on the machine or transformation test—arguing both that

the claims are limited to particular machines, and that the addition of a bookmark effects a transformation of the media file. First, regarding the "machine" argument, Rovi points to two claim limitations—the use of a "media-on-demand system," and the use of "client devices."

As an initial matter, the court finds that a "client device" is no more particular than a generic "general purpose computer," and thus must be rejected as a "particular machine" for the same reason articulated by the *Alice* Court. However, the analysis for the "media-on-demand system" (also referred to as a "media-on-demand server" in the parties' papers) presents a distinct question.

The "particular machine" analysis with respect to the "media-on-demand system" is similar to the one above, in the context of the '762 patent's disclosure of "user television equipment." And as above, the key question for the court is whether the disclosed "media-on-demand system" is more similar to the "generic computer" of *Alice* or the GPS receiver of *SiRF*.

Netflix argues that, in practice, a media-on-demand server is no different from a generic server, and thus, should be rejected for the same reason that the *Alice* Court rejected a general purpose computer as enough to establish patentability. Rovi responds by arguing that *SiRF* directly applies, as the '906 patent discloses machines that "play a significant part in permitting the claimed method to be performed." 601 F.3d at 1332–33. Rovi argues that the "media-on-demand system"—made up of a "media-on-demand server," a "first client device," and a "second client device"—"provide[] users with the ability to receive delivered media (such as a movie) across a network in a client device through a communications link to a media-on-demand server." Rovi's expert opines that "without the [media-on-demand server], the media could not be configured in a format compatible with identified device properties of the first and second client devices and delivered in those different formats to the first and second client devices." Dkt. 121 at 8. Rovi further argues that the media-on-demand server is necessary for recording a specified position in the media, and for pausing and resuming media across different devices with different formats. Dkt. 121 at 8–9.

While *SiRF* may remain good law even in light of *Alice*, it seems apparent that a machine must do more than simply "play a significant part in permitting the claimed method to be performed" in order to supply the required inventive concept. Given *Alice's* rejection of a "general purpose computer" as sufficient to establish patentability, a patentee must show that the machine itself is a particular machine, and not just that a generic machine is being used for a particular purpose. As discussed above, if identifying a particular *function* of a machine were enough to establish patentability under the "machine or transformation" test, then any patentee could evade invalidity by using specific-sounding language to describe a general purpose computer. For instance, the *Alice* patentee could describe the recited general purpose computer as a "settlement risk-mitigating computer," without which the claimed method could not be performed. To allow a patentee's creative description of his claimed computer to govern patent eligibility would be to turn the § 101 analysis into a draftman's art. Such an approach directly contradicts the purpose underlying § 101.

In this case, the court has no basis on which to find that the recited "media-on-demand system" is anything other than a generic server/client system, nor that the "media-on-demand server" is anything other than a generic server. Simply adding the term "media-on-demand" does not

make a generic computer component any more particular.

Aside from the "machine" argument, Rovi separately argues that the "bookmarking" step "transforms the media file," and thus "meaningfully limits the '906 patent claims." For support, Rovi relies on the above-mentioned *Card Verification* case, a post-*Alice* district court case involving a credit card verification method in which a "tag" was appended to the credit card information. *Card Verification*, 2014 WL 4922524.

After first finding that the patent was directed to the abstract idea of verifying credit card information, the *Card Verification* court then applied the second *Alice/Mayo* step, ultimately concluding that the "claims may be sufficiently limited by the transformation that occurs when the randomly-generated tag is added to the confidential information." 2014 WL 4922524, at *5. Although the court noted that "typically, transforming data from one form to another does not qualify as the kind of transformation regarded as an important indicator of patent eligibility," it nonetheless found that "the claimed invention goes beyond manipulating, reorganizing, or collecting data by actually adding a new subset of numbers or characters to the data, thereby fundamentally altering the original confidential information." *Id.*

While the court finds that Rovi's "transformation" argument is stronger than its "machine" argument, there are still several problems with it. First, and most simply, as mentioned above, the *Card Verification* court had before it a motion to dismiss rather than a motion for summary judgment, and was thus "bound to make all reasonable inferences" in favor of the patentee. 2014 WL 4922524, at *4. Specifically, the court considered the question of whether the claimed process might be one that "can be performed by a human mind with nothing more than pen and paper,"

but because such a question was a "factual question inappropriate at the motion to dismiss stage," it denied the motion to dismiss. Because the present case involves a motion for summary judgment with the benefit of a full record of discovery, this court is in a different position than was the *Card Verification* court.

Second, also as mentioned above, while the *Card Verification* court did find sufficient possibility of a "transformation," it cited a Federal Circuit case for the proposition that "the mere manipulation or reorganization of data ... does not satisfy the transformation prong." *Card Verification*, 2014 WL 4922524, at *5 (citing *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed.Cir.2011)). *CyberSource* involved a computerized process for detecting credit card fraud by creating a "map" of credit card numbers and the IP addresses from which those cards were used to complete transactions. The court agreed that the process "manipulates data to organize it in a logical way such that additional fraud tests may be performed," but ultimately held that the "mere manipulation or reorganization of data, however, does not satisfy the transformation prong." 654 F.3d at 1375.

To determine whether to apply *CyberSource* or *Card Verification*, the court must decide whether the addition of a bookmark constitutes mere "manipulation" or "reorganization" of data, or whether it "fundamentally alters" the data. Overall, the court finds that the addition of a bookmark falls short of the "fundamental alteration" of data recognized by the *Card Verification* court. To start, the court fails to see how a bookmark can "fundamentally alter" a file when it is replaced with a new bookmark whenever the user watches a part of the video. Moreover, the only actual change to the data is an update to a video's starting point to account for any

viewing activity from a different device, and such a change is more of a "manipulation" or "reorganization" than a "fundamental alteration." Thus, the court finds that the claimed process fails to sufficiently "transform" the media file for purposes of the "machine or transformation" test.

Independent of the "machine or transformation" test, Rovi separately argues that the "computer-implemented steps do not operate in a normal, expected manner," and thus are "not broadly and generically claimed." Rovi asserts that the claims require the media-on-demand server to perform the following "special functions":

(1) delivering the media to first and second client devices through respective first and second communications links, (2) configuring the media in a format compatible with identified device properties of said first and second client devices, (3) recording a bookmark specifying a position in the media, and (4) delivering the media in a position specified by said recorded bookmark.

Dkt. 121 at 9 (citing '906 patent, claims 1, 6, 8).

The court fails to see how these functions—whether considered individually or as part of an ordered combination—are anything other than the "routine," "conventional" activity that was expressly rejected in *Alice*, *Mayo*, and *Ultramercial*. The four steps enumerated by Rovi do nothing to limit the scope of the claims, and instead, cover *all* applications of bookmarking media files to allow playback on different devices. Unlike *DDR*, where the court found that the "claims at issue do not attempt to preempt every application" of the abstract idea, and instead "recite a specific way to automate the creation of a composite web page," the claims here do indeed preempt every application of the abstract idea. The steps recounted above—delivering the media to the devices in a compatible format, and recording a bookmark to allow playback to begin at that bookmark—are described at such a high degree of abstraction that it is impossible to conclude that they "recite a *specific way*" to record bookmarks for playback across different devices. The claims do little more than describe the abstract idea of bookmarking across devices with an instruction to "apply it."

Rovi also cites to testimony from its expert, who opines that "the required first and second communications links are not a generic or conventional arrangement," but are instead "a particular arrangement that enables the media-on-demand server to perform the specialized function of delivering media to different types of devices depending on the media format the device is capable of receiving." Dkt. 121 at 10 (citing Dkt. 121–1, ¶ 33). However, the court finds these opinions to be wholly conclusory, as Dr. Shamos invokes the words "particular" and "specialized" without explaining *how* the claimed method differs from a conventional method for recording bookmarks for multiple-device playback. While the very idea of allowing multiple-device playback may have been novel at the time of the invention, the second step of the Alice/Mayo test requires more than a novel idea—it requires a specific application of that idea, to ensure that all embodiments of the idea (even if novel) are not preempted.

In sum, while Rovi repeatedly asserts that the '906 patent does "not wholly preempt all practical applications of delivering media to different devices with different capabilities," there court finds no basis to support that assertion. As a result, the court finds that the '906 patent fails to disclose an inventive concept under the second step of Alice/Mayo's test, and thus, is invalid under § 101.

## CONCLUSION

For the foregoing reasons, the court finds that the '929 patent, the '962 patent, the '762 patent, the '709 patent, and the '906 patent are invalid under section 101. Accordingly, Netflix's motion for summary judgment is GRANTED.

Because the court's judgment of invalidity "necessarily moots the issue of infringement," Netflix's declaratory judgment claims for non-infringement and Rovi's counter-claims for infringement are dismissed as moot. *See TypeRight Keyboard Corp. v. Microsoft Corp.,* 374 F.3d 1151, 1157 (Fed.Cir.2004).

**IT IS SO ORDERED.**