**SECURE MAIL SOLUTIONS LLC**

v.

**UNIVERSAL WILDE, INC.**

**Case No. CV 15-7562-DOC (GJSx)**

United States District Court,
C.D. California.

Signed February 16, 2016

Joseph K. Liu, One LLP, Newport Beach, CA, William J O'Brien, One LLP, Beverly Hills, CA, for Secure Mail Solutions LLC.

Gregory Peter Boden, Wilmerhale, Los Angeles, CA, Gregory H. Lantier, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, for Universal Wilde, Inc.

## PROCEEDINGS (IN CHAMBERS): ORDER GRANTING DEFENDANT'S MOTION TO DISMISS [16]

THE HONORABLE DAVID O. CARTER, JUDGE

Before the Court is Defendant Universal Wilde, Inc.'s ("Defendant" or "UW") Motion to Dismiss ("Motion") (Dkt. 16). The Court finds this matter appropriate for resolution without oral argument. Fed. R. Civ. P. 78; L.R. 7-15. Having reviewed the moving papers and considered the parties' arguments, the Court hereby GRANTS Defendant's Motion.

## I. Background

In its Complaint ("Compl.") (Dkt. 1), Plaintiff Secure Mail Solutions LLC ("Plaintiff" or "SMS") asserts claims of patent infringement of seven related patents: U.S. Patent No. 7,814,032 ("the '032 patent"), issued on October 12, 2010; U.S. Patent No. 7,818,268 ("the '268 patent"), issued on October 19, 2010; U.S. Patent No. 8,073,787 ("the '787 patent"), issued on December 6, 2011; U.S. Patent No. 8,260,629 ("the '629 patent"), issued on September 4, 2012; U.S. Patent No. 8,429,093 ("the '093 patent"), issued on April 23, 2013; U.S. Patent No. 8,910,860 ("the '860 patent"), issued on December 16, 2014; and U.S. Patent No. 9,105,002 ("the '002 patent"), issued on August 11, 2015. Collectively, the Court will refer to these patents as the "SMS patents." In total, there are 234 claims in the SMS patents, and Plaintiff asserts 143 of them against UW. Opp'n at 1. Plaintiff highlights four of the claims in its Complaint. Mot. at 6; *See generally* Compl.

The inventor and president of SMS, Todd Fitzsimmons ("Fitzsimmons"), developed the idea for these seven patents after the events of September 11, 2011. Declaration of Todd Fitzsimmons ("Fitzsimmons Decl.") (Dkt. 21-1) ¶¶ 2–3. Mr. Fitzsimmons imagined that the patented system could protect mail recipients from possible anthrax or explosive attacks by mail because the system would permit recipients to verify the source of the package before opening it. *Id.* ¶¶ 3–4. SMS asserts that these inventions have greatly improved the "safety and security of mail." *See* Compl. ¶ 8.

### A. The IMb Patents

SMS refers to the '032 patent, '268 patent, and '787 patent as the "IMb Patents." Opp'n at 5. These three patents "claim subject matter that includes a novel barcode, which has since been adopted by the United States Postal Service, and is referred to as the Intelligent Mail barcode." Fitzsimmons Decl ¶ 7.

Claim 1 of the '268 patent, which is featured in the Complaint, reads as follows:

1. A method of verifying mail identification data, comprising:

Affixing mail identification data to at least one mail object, said mail identification data comprising a single set of encoded data that includes at least a unique identifier, sender data, recipient data and shipping method data, wherein said unique identifier consists of a numeric value assigned by a sender of said at least one mail object.

Storing at least a verifying portion of said mail identification data;

Receiving by a computer at least an authenticating portion of said mail iden-

tification data from at least one reception device via a network, wherein said authenticating portion of said mail identification data comprises at least said sender data and said shipping method data; and

Providing by said computer mail verification data via said network when said authenticating portion of said mail identification data corresponds with said verifying portion of said mail identification data.

Compl. ¶ 10; *See* '268 Patent at Col. 6:18–37.

The abstract of the '268 patent states in full:

> A system and method is provided for transmitting mail verification data over a wide area network, such as the Internet, in response to receiving and authenticating at least a portion of mail identification (ID) data. In one embodiment of the present invention, a mail verification application is adapted to store at least a verifying portion (e.g., an identifiable code portion, a shipping portion, a recipient portion, etc.) of mail ID data in memory. The mail ID data is then affixed to a mail object. The mail object is then manually delivered to a recipient. At least an authenticating portion of the mail ID data is then provided to a reception device. The reception device, which communicates with the mail ID device over a wide area network, transmits at least the authenticating portion of the mail ID data to the mail verification application operating on the mail ID device. The mail verification application then compares the authenticating portion of the mail ID data with the verifying portion stored in memory. If the authenticating portion of the mail ID data is authenticated, mail verification data is sent to the reception device. In one embodiment

of the present invention, at least a portion of the mail verification data includes authenticating data, securing data, sender data, recipient data, mail-content data, downloadable-product data, sender-web-page data, and/or third-party-web-page data.

'268 Patent Abstract.

## B. The Personalized QR Code Patents

SMS refers to the '629 and '093 patents as the "Personalized QR Code patents." Opp'n at 5. SMS states that these two patents "claim a barcode that has been personalized for the recipient of the mail piece." *Id.*

Claim 1 of the '093 patent, which Plaintiff cites to in the Complaint, provides:

A method for providing electronic data to a recipient of a mail object, comprising:

Generating, by a processor, a barcode for a mail object, said barcode including at least a first set of mail data including data corresponding to said recipient of said mail object;

affixing said barcode to said mail object;

submitting said mail object to a mail carrier for delivery to said recipient of said mail object;

receiving said first set of mail data, including data corresponding to said recipient of said mail object, from a reception device of said recipient via a network;

wherein said reception device displays said electronic data to a recipient of said mail object by displaying said electronic data on a screen of said reception device.

Compl. ¶ 18; '093 Patent at Col. 6:22–40. The abstract of the '093 patent is substantially similar to the abstract of the '268 patent. *See* '093 Patent Abstract.

## C. The pURL Patents

Plaintiff contends that the two remaining patents-in-suit—the '860 patent and the '002 patent—"claim mail identification data that has been personalized for the recipient of the mail piece (using, for example, a personalized network address) and thus cover (among other things) a 'personalized uniform resource locator, or pURL'" Opp'n at 5.

In its Complaint, SMS highlights Claim 1 of the '002 patent, which states:

A method for providing electronic data to a recipient of a mail object, comprising;

using an output device to affix a single set of mail ID data to said mail object, said single set of mail including at least recipient data, said recipient data comprising a personalized network address associated with said recipient of said mail object;

submitting said mail object to a mail carrier for delivery to said recipient of said mail object;

receiving said recipient data from a reception device of said recipient via a network; and

providing by at least one processor said electronic data to said reception device via said network in response to receiving said recipient data, said electronic data comprising a sender's web page that identifies said recipient of said mail object and includes data corresponding to a content of said mail object;

wherein said electronic data is configured to be displayed to said recipient via a web browser on a display of said reception device.

Compl. ¶ 26; '002 Patent at Col. 6:35–54. The abstract for the '002 patent is substantially similar to the abstract of the '268 abstract quoted above.

## D. Procedural History

On April 8, 2014, in a separate litigation, this Court issued a Claim Construction Order in which it construed four terms of the '268 patent and the '787 patent. *See* Final Order on Claim Construction ("Claim Construction Order") (Dkt. 195), *Secured Mail Solutions LLC v. Advanced Image Direct LLC et al.*, Case No. SA CV 12-1090-DOC (RNBx). In the Claim Construction Order, the Court construed four terms in ' the '268 and '787 patents: (1) "sender" and related terms; (2) "recipient" and related terms; (3) "mail verification data" and "verifying data"; and (4) "mail verification device."

Plaintiff filed the instant suit on September 25, 2015 (Dkt. 1). The case was transferred to this Court on September 30, 2015 (Dkt. 11).

Defendant filed the instant Motion on November 23, 2015. Plaintiff opposed on December 7, 2015 (Dkt. 21), and Defendant replied on December 14, 2015 (Dkt. 22)

## II. Legal Standard

### A. Standard Under 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to set forth a set of facts which, if true, would entitle the complainant to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (holding that a claim must be facially plausible in order to survive a motion to dismiss). The pleadings must raise the right to relief beyond the speculative level; a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (citing

*Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). On a motion to dismiss, this court accepts as true a plaintiff's well-pleaded factual allegations and construes all factual inferences in the light most favorable to the plaintiff. *See Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1031 (9th Cir. 2008). The court is not required to accept as true legal conclusions couched as factual allegations. *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937.

In evaluating a Rule 12(b)(6) motion, review is ordinarily limited to the contents of the complaint and material properly submitted with the complaint. *Van Buskirk v. Cable News Network, Inc.,* 284 F.3d 977, 980 (9th Cir.2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1990). Under the incorporation by reference doctrine, the court may also consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara,* 307 F.3d 1119, 1121 (9th Cir.2002). The court may treat such a document as "part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir.2003).

█ Dismissal with leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). This policy is applied with "extreme liberality." *Morongo Band of Mission Indians v. Rose,* 893 F.2d 1074, 1079 (9th Cir.1990); *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir.2000) (holding that dismissal with leave to amend should be granted even if no request to amend was made). Dismissal without leave to amend is appropriate only when the court is satisfied that the defi-ciencies in the complaint could not possibly be cured by amendment. *Jackson v. Carey,* 353 F.3d 750, 758 (9th Cir.2003).

## B. Patent Eligibility Under 35 U.S.C. § 101

Section 101 of the Patent Act provides that a patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. The Supreme Court has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l,* — U.S. ——, 134 S.Ct. 2347, 2354, 189 L.Ed.2d 296 (2014). "The concern that drives this exclusionary principle" is "one of pre-emption." *Id.* In other words, the concern is " 'that patent law not inhibit further discovery by improperly tying up the future use of' these building blocks of human ingenuity." *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.,* — U.S. ——, 132 S.Ct. 1289, 1301, 182 L.Ed.2d 321 (2012)). *Alice* warns courts, however, to "tread carefully in construing this exclusionary principle lest it swallow all of patent law," because "[a]t some level, 'all inventions … embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.' " *Id.* (quoting *Mayo,* 132 S.Ct. at 1293).

In *Alice,* the Court followed the framework it established in *Mayo* "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Id.* at 2355. First, the court asks "whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* If so, the court then "consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the ad-

ditional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 132 S.Ct. at 1298, 1297). In this second step, the court looks for an "inventive concept"—that is, "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (quoting *Mayo*, 132 S.Ct. at 1294).

This standard is easier to articulate than it is to apply. "The line between a patentable 'process' and an unpatentable 'principle' is not always clear." *Parker v. Flook*, 437 U.S. 584, 589, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978). The Federal Circuit has referred to § 101 jurisprudence as a "murky morass." *MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1259 (Fed.Cir. 2012) (suggesting, in dicta, that "courts could avoid the swamp of verbiage that is § 101" by addressing patentability defenses under §§ 102, 103, and 112 before addressing patent eligibility under § 101). Judge Pfaelzer recently lamented that "Supreme Court decisions on § 101 often confuse more than they clarify." *California Inst. of Tech. v. Hughes Commc'ns Inc.*, 59 F.Supp.3d 974, 980 (C.D.Cal.2014); *see also MySpace, Inc.*, 672 F.3d at 1259 ("Our opinions spend page after page revisiting our cases and those of the Supreme Court, and still we continue to disagree vigorously over what is or is not patentable subject matter."). Pinning down the exclusion for "abstract ideas" can be particularly challenging. *See MySpace, Inc.*, 672 F.3d at 1259 ("When it comes to explaining what is to be understood by 'abstract ideas' in terms that are something less than abstract, courts have been less successful.").

## C. Ripeness of Deciding Patent Eligibility, Defendant's Burden, and Representative Claims

"Patent eligibility under § 101 is a question of law that may, in appropriate cases, be decided on the pleadings without the benefit of a claims construction hearing." *Modern Telecom Sys. LLC v. Earthlink, Inc.*, No. SA CV 14–0347–DOC (ANx), 2015 WL 1239992, at *6 (C.D.Cal. Mar. 17, 2015); (affirming district court's decision to grant motion to dismiss based on patent ineligible subject matter under § 101 without having a claims construction hearing); (citing *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1349 (Fed.Cir. 2014)); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 711 (Fed.Cir.2014) (same).

The Court notes that it previously construed several of the claims at issue in a prior matter. *See generally* Claim Construction Order. Further, Plaintiff does not argue that additional claim construction is necessary.[1] *See Open Text S.A. v. Alfresco Software Ltd*, Case No. 13–cv–04843–JD, 2014 WL 4684429, at *3 (N.D.Cal. Sept. 19, 2014) ("[T]his lack of dispute over the proper construction of the asserted claims confirms that it is unnecessary to engage in claim construction before addressing validity under Section 101."). Therefore, the Court concludes that "[s]eparate claim construction proceedings are therefore not necessary to determine" patent eligibility. *Boar's Head Corp. v. DirectApps, Inc.*, No. 2:14–cv–01927–KJM–KJN, 2015 WL 4530596, at *8 (E.D.Cal. July 28, 2015).

Additionally, the Court notes that "Defendants' burden in seeking to dismiss plaintiff's claim based on patent ineligibility is high because of the Patent's presump-

---

1. Plaintiff instead argues that Defendant's "analysis is fatally flawed by its failure to recognize important limitations in SMS's claims as construed by the Court." Opp'n at 1.

tive validity." *Boar's Head Corp.*, 2015 WL 4530596, at *3. "[I]n applying § 101 jurisprudence at the pleading stage, the Court construes the patent claims in a manner most favorable to Plaintiff." *Modern Telecom*, 2015 WL 1239992, at *8 (citing *Content Extraction*, 776 F.3d at 1349).

Finally, the Court recognizes the parties' dispute concerning whether and how the Court should use representative claims. Plaintiff argues that Defendant improperly "lumps together all of the IMb Patents, Personalized QR Code Patents, and pURL Patents" and therefore "Defendant has failed to address the many differences between SMS's seven patents and the hundreds of claims of those patents." Opp'n at 9. Defendant responds that it is well established that "courts need not analyze each and every asserted claim with the same degree of precision." Mot. at 6 n.6. Defendant further argues that it simply analyzed the four "representative claims that *SMS* identified in its complaint . . . ." Reply at 9.

The Court agrees with Defendant that it is well-established that courts do not need to assess every claim in conducting a § 101 analysis. *See CMG Fin. Servs. v. Pac. Trust Bank, F.S.B.i*, 50 F.Supp.3d 1306, 1314 (C.D.Cal.2014) (citation omitted) ("Comparing the language of the systems claims with that of the method claims, it is clear that these are functionally identical ... Thus, they must be treated as equivalent for purposes of the § 101 analysis."); *see also Bascom Research, LLC v. LinkedIn, Inc.*, 77 F.Supp.3d 940, 943 n. 3 (N.D.Cal.2015) ("Defendants assert, and the Court agrees, that claim 45 of the '974 patent is representative of the asserted claims."). Here, the Court finds that the four claims included Plaintiff's complaint are sufficiently similar to the other asserted claims to warranting treating them as

"representative" for purposes of the § 101 analysis.[2] In any event, the Court, where necessary, still evaluates Plaintiff's arguments that other specific "claims include features that either add to the patentability or are themselves patentable." Opp'n at 9.

## III. Discussion

In its Motion, Defendant argues that each of the asserted claims of the seven patents are not patent-eligible under § 101 because the claims "are all directed to the abstract idea—communicating information associated with a mailpiece by use of a marking on the mail's packaging," Mot. at 1, and because Plaintiff has failed to supply any inventive concept, *id.* at 18. Plaintiff responds that Defendant "has failed to properly perform the first step of the analysis mandated by the Supreme Court" and that the claims at issue "are replete with inventive features." Opp'n at 2.

### A. Step One of the *Mayo* Test

Under the first step of the *Mayo* test, the Court must determine whether the patent claims at issue are directed to abstract ideas. As an initial matter, the Court notes that, "identifying the precise nature of the abstract idea" to which Plaintiff's patent claims are directed "is not as straightforward as in *Alice* or some of [the Federal Circuit's] other recent abstract idea cases." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir.2014). Although there is some disagreement among courts as to how expansively a claim should be examined at Step One of the *Mayo* test, the Federal Circuit and courts in this district instruct courts to examine the *purpose* of a challenged claim to determine whether it is directed to an abstract idea. *See California. Inst. Tech.*,

---

**2.** The four claims are: claim 1 of the '268 patent, claim 1 of the '093 patent, claim 1 of the '002 patent, and claim 1 of the '860 patent.

59 F.Supp.3d at 991–92 (requiring that a court "identify the purpose of the claim—in other words, what the claimed invention is trying to achieve—and ask whether that purpose is abstract," making the *Mayo* step 1 "a sort of 'quick look' test, the object of which is to identify a risk of preemption and ineligibility").

For example, the claims in *Alice* were directed to the abstract idea of intermediated settlement, "*i.e.*, the use of a third party to mitigate settlement risk," and "simply instruct[ed] the practitioner to implement the abstract idea ... on a generic computer." *Alice*, 134 S.Ct. at 2356, 2359. In *Ultramercial*, 772 F.3d at 715, the claims were directed to the abstract idea of "using advertisement as an exchange or currency." In *buySAFE, Inc. v. Google Inc.*, the claims simply invoked a generic computer to implement the abstract concept of "creating a contractual relationship—a 'transaction performance guaranty'—that is beyond question of ancient lineage." 765 F.3d 1350, 1355 (Fed. Cir.2014). In *Content Extraction*, the claims were "drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory." 776 F.3d at 1347. In *Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.*, the claims simply recited "a process of taking two data sets," which were "generated by taking existing information ... and organizing this information into a new form" and "combining them into a single data set." 758 F.3d 1344, 1351 (Fed.Cir.2014).

█ Here, Defendant argues that "[a]ll claims of the Secured Mail Patents are directed to the abstract idea of communicating information associated with a mailpiece by use of marking on the mail's packaging." Mot. at 13. Defendant references claim 1 of the '093 patent, which encompasses a "method of providing elec-

tronic data to a recipient of a mail object" in part by "generating a barcode including data corresponding to the recipient of the mail object." *Id.* at 13–14; *see* '093 Patent at Col. 6:22–27. Thus, Defendant argues the SMS patents are "directed to nothing more than communicating information about the contents of the mailpiece through use of a marking (a barcode) affixed to the mailpiece." *Id.* at 14. In response, Plaintiff argues the SMS patents are directed to more than a mere abstract idea because they refer to a "sender-based system that is configured to send data identifying the recipient of the mail piece and data corresponding to the content of the mail piece." Opp'n at 14.

The Court agrees that Defendant's position better captures the nature of the asserted claims, and accordingly finds that the claims are directed to an abstract idea. The abstract of *each* of the seven SMS patents states that, "mail ID data is [ ] affixed to a mail object," which allows for the "transmi[ssion] [of] information over a wide area network." *See, e.g.*, '268 Patent. "Moreover, the patents' recited purpose is consistent with the language of the claims." *GT Nexus, Inc. v. Inttra, Inc.*, Case No: C 11–02145–SBA, 2015 WL 6747142, at *4 (N.D.Cal. Nov. 5, 2015) (quotation omitted). For instance, claim 1 of the '002 patent provides: "A method for providing electronic data to a recipient of a mail object, comprising: using an output device to affix a single set of mail ID data to said mail object." '002 Patent at Col. 6:35–37.

The Court finds that attaching "mail ID data" to a piece of mail—which is often accomplished, for example, by using a barcode—that transmits information about that piece of mail to a recipient is directed to the abstract idea of communicating information associated with a mailpiece by use of a marking. This finding is further

supported by looking to the names of the asserted patents—in particular, the '093,- '860, and '002 patents, which are labeled "System and Method for Providing Information to a Recipient of a Physical Mail Object."[3] *See* '093 Patent; '860 Patent; '002 Patent. Therefore, the Court finds that each of the SMS patents are directed to the abstract idea of communicating information about a mailpiece by use of a marking.

Plaintiff "does not meaningfully challenge this assertion in its opposition." *Netflix, Inc. v. Rovi Corp.*, 114 F.Supp.3d 927, 940 (N.D.Cal.2015). Fundamentally, Plaintiff fails to "offer any alternative characterization of the idea underlying its claim." *Gametek LLC v. Zynga, Inc.*, Nos. CV 13- 2546 RS, 2014 WL 1665090, at *4 (N.D.Cal. Apr. 25, 2014). Instead, Plaintiff either misunderstands or attempts to sidestep the Step One analysis by repeatedly emphasizing the inventiveness of its asserted patents. *See* Opp'n at 13 ("UW ignores this aspect of the invention, which is not only an inventive aspect itself, but is how the sender-based system can authenticate the mail piece, and how the sender-based system can open a bi-directional communication channel with the recipient, thereby allowing other mail-related information to be provided."). These arguments are irrelevant at Step One. *See Ultramercial*, 772 F.3d at 715. Plaintiff also takes issue with Defendant's "broad portrayal of the patents," Opp'n at 12, but of course, at Step One, "[c]ourts should recite a claim's purpose at a reasonably high level of generality." *Enfish, LLC v. Microsoft Corp.*, 56 F.Supp.3d 1167, 1173 (C.D.Cal.2014); *see also Open Text S.A. v. Box, Inc.*, 78 F.Supp.3d 1043, 1046 (N.D.Cal.2015) (noting that in evaluating the first prong of the

*Mayo* test, "the Court distills the gist of the claim.").

Finally, Plaintiff argues that because the SMS patents describe "concrete, technological features and processes," they cannot be directed to an abstract idea. *See* Opp'n at 13. This argument is also misguided. The claims at issue repeatedly refer to generic technological components, such as "mail verification device," "reception device," a "processor," and "database." *See, e.g.,* '268 Patent at Col.6:29–31) ("at least a portion of the mail verification data is sent to the reception device"); *id.* at Col. 8:65–67 ("at least one *mail verification device* adapted to communicate with at least one *reception device* via a network") (emphasis added); '002 Patent at Col. 8:13–15 ("a *processor*; at least one application operating on at least *said processor*") (emphasis added). As several courts have recognized, the generic reference to technological components is largely irrelevant to the Step One analysis. *See California Inst. of Tech.*, 59 F.Supp.3d 974 at 993 ("Courts must ignore generic recitation of hardware at step one, when the claimed hardware essentially performs a method."); *see also Enfish*, 56 F.Supp.3d at 1176 ("When a claim recites a computer generically, the Court should ignore this element in defining the claim's purpose.") (citing *Alice*, 134 S.Ct. at 2356–57 (defining the claims purpose as intermediated settlement, not achieving intermediated settlement on a computer)). The Court adds that the claims' reference to a network "does not save the claim from abstraction." *See Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366 (Fed.Cir.2015) ("An abstract idea does not become nonabstract by limiting the invention to a particular field of use or techno-

---

**3.** The '032, '268, and '787 patents are titled "System and Method for Mail Verification," and the '629 patent is titled "System and Method for Providing an Advertisement to a Recipient of a Physical Mail Object."

logical environment, such as the Internet.").

Additionally, the Court notes Plaintiff's argument that the SMS patents are directed at solving a specific problem does not alter the analysis. For one, nowhere do the claims reference the specific problem the SMS patents were designed to solve. *OpenTv, Inc. v. Apple, Inc.*, Case No. 14–cv–01622–HSG, 2015 WL 1535328, at *4 (N.D.Cal. Apr. 6, 2015) ("[N]owhere do the '799 Patent claims say anything about 'malicious eavesdropping' or 'interactive information systems' ... On their face, then, the claims do not say what OpenTV claims they say."). Even more, solutions to the problem of securing and communicating information about mail predate Plaintiffs' patents. *See id.*("The problem of how to transmit, receive, store, and organize confidential information deriving from multiple sources is not a creature of the Internet age: solutions to this problem date back to the invention of smoke signals."). In *OpenTv, Inc. v. Apple, Inc.*, the court considered plaintiff's argument that the patent at issue was "not directed to an abstract idea because it describes a specific solution to overcome a technological problem that arose in the realm of electronic communications for interactive information systems, such as interactive television." Case No. 14–cv–01622–HSG, 2015 WL 1535328, at *4 (N.D.Cal. Apr. 6, 2015) (internal quotation marks and citation omitted). The *OpenTv* court handily rejected this argument, finding "the problem of transmitting confidential information using unsecured communication methods has existed for centuries, long before the advent of interactive television networks. The '799 Patent claims are drawn to the abstract idea of using identification codes to solve this age-old problem." *Id.* at *5 (citing *Planet Bingo, LLC v. VKGS LLC*, 576 Fed.Appx. 1005, 1006–07 (Fed. Cir.2014)) (holding that claims were directed to the abstract idea of preventing "tam-

pering problem[s]" and "other security risks" during commercial transactions) (internal quotation marks and citations omitted). The same is true here. Thus, the fact that the SMS patents were designed with a specific problem in mind does not change the outcome of the above Step One analysis.

For the reasons stated above, the Court concludes the SMS patents are directed to an abstract idea. Accordingly, the Court turns to the second prong of the patent eligibility inquiry.

### B. Step Two of the *Mayo* Test

Having concluded the SMS patents are directed to the abstract idea of communicating information associated with a mailpiece by use of a marking, the Court now "examine[s] the limitations of the claims to determine whether the claims contain an 'inventive concept' to 'transform' the claimed abstract idea into patent-eligible subject matter." *Ultramercial*, 772 F.3d at 715 (quoting *Alice*, 134 S.Ct. at 2357).

Under the second step of the *Mayo* test, the Court considers whether the elements of each claim, either individually or "as an ordered combination," include an "inventive concept" such that " 'the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.' " *Alice*, 134 S.Ct. at 2355 (quoting *Mayo*, 132 S.Ct. at 1294). "A claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].' " *Alice*, 134 S.Ct. at 2357 (quoting *Mayo*, 132 S.Ct. at 1297) (alterations in original). "Those 'additional features' must be more than 'well-understood, routine, conventional activity.' " *Ultramercial II*, 772 F.3d at 715 (quoting *Mayo*, 132 S.Ct. at 1298). As the "Supreme Court and the Federal Circuit have made perfectly clear,

merely implementing an abstract idea on conventional computer technology is not enough." *IPLearn–Focus, LLC v. Microsoft Corp.*, Case No. 14–cv–00151–JD, 2015 WL 4192092, at \*4 (N.D.Cal. July 10, 2015).

It is important to note that "the search for an 'inventive concept' places no importance on the novelty of the abstract idea. A novel abstract idea is still an abstract idea, and is therefore unpatentable." *Netflix*, 114 F.Supp.3d at 937–38; *see also IpLearn, LLC v. K12 Inc.*, 76 F.Supp.3d 525, 534 (D.Del.2014) ("A new idea, i.e., one that is non-anticipated and non-obvious, does not, however, make an abstract idea patent eligible."); *see also Bilski v. Kappos*, 561 U.S. 593, 610–11, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010) ("[T]he fact that a company may be the first to successfully apply an abstract idea within a new technological context does not transform the abstract idea into something tangible and patentable."). Further, "even if a claim does not wholly pre-empt an abstract idea, it still will not be limited meaningfully if it contains only insignificant or token pre or post-solution activity—such as identifying a relevant audience, a category of use, field of use, or technological environment." *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1346 (Fed.Cir.2013).

Defendant contends the SMS patents fail Step Two of the *Mayo* test because "[n]one of the remaining elements of the claims, alone or in combination, adds an inventive idea that would render them patent eligible." Mot. at 17. Defendants specifically argue that the claim elements "all consist of hardware that was known in the art at the time of filing;" the claims consist of "conventional computing components (or humans) acting in conventional ways;" the patents provide no explanation on how the claimed limitations are accomplished; and the remaining limitations of the SMS patents add no inventive concepts. Mot. at 18–19, 21–22.

In response, Plaintiff asserts the "evidence shows that SMS's claims include several significant inventive concepts, including solutions to solve several problems in the mailing and shopping industry and safety problems." Opp'n at 14. According to Plaintiff, the most critical inventive concept "in the IMb Patents is the sender-generated barcode," which provides a "single set of encoded data that includes at least a unique identifier, sender data, recipient data and shipping method data, wherein said unique identifier consists of a numeric value assigned by a sender of said at least one mail object." *Id.* at 15 (citing '268 Patent at Col. 6:21–26). Plaintiff notes the "inventions of the IMb Patents may seem conventional now, but they were highly inventive in 2001." *Id.* at 17. Plaintiff contends the QR Code Patents and pURL Patents "contain still further inventive concepts." *Id.*[4]

### 1. Initial Concerns

After a review of the SMS patents, the Court finds that the asserted "claims do not contain the required inventive concept to save the" SMS patents from ineligibility under § 101. *See OpenTv*, 2015 WL 1535328, at \*5. As an initial matter, the majority of the steps of the

---

4. Plaintiff also argues that both the United States Patent and Trademark Office ("USPTO") and the United States Postal Service has recognized the patents' inventive concepts. *Id.* at 19–20. The Court has reviewed and considered the prosecution history presented by Plaintiffs in its exhibits, including the dialogue at the BPAI hearing, With respect to the United States Postal Service's adoption of the Intelligent Mail Barcode, the Court agrees with Defendant that it has "no bearing on the patentability of the Secured Mail Patents." Reply at 11 n.4. "[T]hird-party usage of a concept is not evidence of patentability of that concept." *Id.*

asserted claims comprise the abstract concept of communicating information about a mailpiece by using a marking *See id.* at 715–16. "Adding routine additional steps" does not transform an otherwise abstract idea into patent-eligible subject matter. *Ultramercial*, 772 F.3d at 716. The claims at issue here are replete with such steps, including "affixing mail identification data," such as a barcode, to a piece of mail or "submitting said mail object to a mail carrier for delivery." *See, e.g.*, '268 Patent at Col. 6:20; '093 Patent at Col. 6:29. These are quintessential and basic steps related to communicating information about and sending a piece of mail. Second, the Court is troubled because the claims in the SMS patents continually reference generic hardware and software. *See, e.g.*, '268 Patent at Col. 6:29–31) ("at least a portion of the mail verification data is sent to the reception device"); *see id.* at Col. 8:65–67 ("at least one *mail verification device* adapted to communicate with at least one *reception device* via a network") (emphasis added), '093 Patent at Col. 1:22–26 ("The present invention relates to mail verification, and more particularly to a system and method of authenticating at least one mail object by providing at least a portion of mail identification data over a wide area network, such as the Internet, in order to receive mail verification data."). To the contrary, as Defendant notes, the SMS patents "stress that the invention can be performed using all types of well-known hardware, such as personal computers, set top boxes, PDAs, mobile phones, land-line phones, televisions, bar code readers, keyboards, RFID readers, smart card readers, IC readers, printers and other data storage devices." Mot. at 18 (citing '268 Patent at Col. 3:25–30; *id.* at Col. 4:64–67; *id.* at Col. 5:13–15); *see also* '093 Patent at Col. 5:8–14 ("It should be appreciated that affixing mail ID data on the mail object includes, but is not limited, to printing or attaching mail ID data directly on the outer surface of the mail object or printing/storing the mail ID data on labels, ICs, smart cards, RFID tags, or any other data storage devices (or materials) generally known to those skilled in the art ....). "Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional feature[e] that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Alice*, 134 S.Ct. at 2358 (quoting *Mayo*, 132 S.Ct. at 1297). "The claims' invocation of [a network such as] the Internet also adds no inventive concept." *Ultramercial*, 772 F.3d at 716. Similarly, claims pertaining to storing, receiving data, and providing that data via a network, *see, e.g.*, '268 Patent at Col. 6:27–34, are simply "routine and generic processing and storing capability[y] of computers generally." *Affinity Labs of Texas, LLC v. DirecTV, LLC*, 2015 WL 3764356, at *21 (W.D.Tex. July 7, 2015).

### 2. Sender-Generated Barcode

A closer examination of the claim limitations supports a finding of patent ineligibility. First, with respect to the IMb patents, the key claim is claim 1 of the '268 patent. As noted above, Plaintiff argues that "[o]ne of the multiple important inventive concepts in the IMb Patents is *the sender-generated barcode*." Opp'n at 15. In the Court's view, this is the core Step Two issue in this case. Plaintiff contends the SMS patents are inventive because "the sender can actually generate, or create, the unique identifier" that is attached to the piece of mail. Opp'n at 16. More specifically, Plaintiff describes the creation of the sender-generated barcode as follows: "a single set of encoded data that includes at least a unique identifier, sender data, recipient data and shipping method data, wherein said unique identifier consists of a numeric value assigned by a sender of said

at least one mail object." *Id.* at 15; '268 at Col. 6:21–26.[5] Put simply, according to Plaintiff, the relevant IMb patents claims are inventive because a sender of a piece of mail can generate a unique barcode (or other "mail identification data") and then attach that barcode or mail ID data to a piece of mail.

The Court does not find this sender-generated barcode to be sufficiently inventive for several reasons. For one, the SMS patents simply rely on existing, well-known, standard technology. Plaintiff argues that "a [sender-based] system was novel in 2001," Opp'n at 4, but that is not the relevant inquiry at Step Two. Rather, the key question is whether the *underlying* "technology described in the patents [was] well-known at the time of filing or simply involve[ed] performance of 'well-understood, routine, and conventional activities commonly used in the industry.'" *Modern Telecom Sys. v. Earthlink, Inc.*, 2015 WL 1239992, at *9 (quoting *Content Extraction*, 776 F.3d at 1348). Indeed, Plaintiff does not argue the use of barcodes and other unique identifiers on pieces of mail is new. Mot. at 19 ("Using a computer to generate a barcode is merely conventional pre-solution activity and is not even arguably inventive."); Reply at 5–6 ("SMS does not contend (nor could it contend) that the claims teach an inventive method to create the barcode or an inventive apparatus for doing so"); *see Content Extraction*, 776 F.3d at 1348 ("['Patentee] conceded at oral argument that the use of a scanner or other digitizing device to extra data from a document was well-known at the time of filing, as well as the ability of computers to translate the shapes on a physical page into typeface

characters."). Employing a barcode to electronically communicate data is an abstract idea that cannot be saved by narrowing the application to postal mail or personalizing the barcode for the recipient of the mail piece. In fact, the application is not even inventive in the postal context as the broad idea of communicating data through barcodes is used ubiquitously through postal tracking and the sending of electronic mail delivery receipts.

Plaintiff's argument that this generic technology was not used in this particular field until 2001, *see* Opp'n at 4, therefore is unavailing. Indeed, as the *Ultramercial* held, "That some of the eleven steps were not previously employed in the art is not enough—standing alone—to confer patent eligibility upon the claims at issue." 772 F.2d at 716. Put differently, whether it was unconventional for senders—as opposed to mail carriers—to generate barcodes or other "mail identification data" and affix those to pieces of mail may be relevant to a novelty analysis under 35 U.S.C. § 102; but it does not resolve the question currently before the Court. *See Bilski*, 561 U.S. 593 at 610–11, 130 S.Ct. 3218 ("[T]he fact that a company may be the first to successfully apply an abstract idea within a new technological context does not transform the abstract idea into something tangible and patentable.").

Rather, the key inquiry is whether or not the claimed limitation provides an inventive concept. To this end, Plaintiff argues the development of a unique, sender-generated identifier *is* the critical invention. The relevant claim from the '268 patent reads, "mail identification data comprising a single set of encoded data that includes at least a unique identifier, sender

---

**5.** The Court notes that claims 18 and 33 of the '268 patent, and claims 1, 7, 11, 12, and 21, 30 of '860 patent also refer to either a "single set of encoded data" or a "single set of mail ID data." Claims 5, 6, 9, 18, 20, 21, 28, 29, 33, and 39 of the '268 patent reference the "unique identifier." The '032 patent and '787 patent use the term "single barcode."

data, recipient data and shipping method data, wherein said unique identifier consists of a numeric value assigned by a sender of said at least one mail object." *See also* Opp'n at 16 ("[I]n one embodiment of the invention, the claims concatenate both sender data, recipient data, and shipping data onto the sender-generated identifier to create a truly unique identification number . . . .").

The Court does not find this claim to be inventive. The creation of a unique identifier by concatenating—or combining—four pieces of data is not sufficiently inventive. The *Digitech* court considered a similar issue in invalidating a "method for creating a device profile within a digital image processing system." *Digitech*, 758 F.3d at 1347. In affirming the district court's decision to invalidate the patent, that court wrote,

> The above claim recites a process of taking two data sets and combining them into a single data set, the device profile. The data sets are generated by taking existing information . . . and organizing this information into a new form. The above claim thus recites an ineligible abstract process of gathering and combining data that does not require input from a physical device. As discussed above, the two data sets and the resulting device profile are ineligible subject matter. Without additional limitations, a process that employs mathematical algorithms to generate additional information is not patent eligible.

*Id.* at 1351. The same is true here. Accordingly, the Court does not deem that the barcode (or other mail identification data) generated by the sender, as opposed to a mail carrier, to be sufficiently inventive.

But *even if* the sender-generated barcode (or other mail identification data) was a sufficiently inventive concept, the SMS patents suffer from an additional flaw: the SMS patents lack specificity in describing the supposedly inventive concepts. As Defendant puts it, the SMS patents do not "disclose *how* the sender generates the information." Reply at 5–6; *see id.* at 2 ("Assigning the originator of a communication, however, is an abstract concept, (as SMS appears to concede), the SMS patents do not describe or claim how this information is generated."). In this case, the '268 patent does not describe how the specific process or method for creating the sender-generated barcode (or other mail ID data). In other words, claim 1 of the '268 patent instead refers to routine "steps at 'a high level of generality, which is insufficient to supply an inventive concept.'" *Broadband iTV, Inc. v. Hawaiian Telecom, Inc.*, 136 F.Supp.3d 1228, 1241 (D.Haw.2015) (quoting *Ultramercial*, 772 F.3d at 716); *see also Mkt. Track, LLC v. Efficient Collaborative Retail Mktg., LLC*, No. 14 C 4957, 2015 WL 3637740, at *8 (N.D.Ill. June 11, 2015); *see also id.* ("Notably, the '083 Patent does not disclose any technical description of *how* the steps in the process take place."). And contrary to Plaintiff's suggestion, *see* Opp'n at 21, the claims at issue are not "rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR*, 773 F.3d at 1257. Therefore, the Court concludes that a sender-generated barcode does not add "significantly more" to the abstract ideas of gathering and combining data, and to communicating information about a piece of mail by use of a marking.[6]

---

**6.** As noted earlier, Plaintiff did not offer an alternative to Defendant's characterization of the abstract idea in this case. The Court recognizes that an alternate formulation of the abstract idea may very well have been "the concept of verifying transaction information."

*Card Verification Solutions, LLC v. Citigroup Inc.*, 13 C 6339, 2014 WL 4922524, at *4 (N.D.Ill. Sept. 29, 2014); *see also Morsa v. Facebook, Inc.*, 77 F.Supp.3d 1007, 1014 (C.D.Cal.2014) (recognizing that claims may

### 3. Bi-Directional Communication Line

Separately, Plaintiff argues the asserted claims are inventive because "this system and method can also be used to open a bi-directional communication line between a recipient and a sender of a mail piece, thereby allowing the exchange of mail related information, either from the sender to the recipient (for example, providing assembly instructions or warranty information) or from the recipient to the sender (for example, acknowledging receipt of the mail piece)." Opp'n at 4. In support of this argument, Plaintiff references claims from the Personalized QR and pURL patents. Plaintiff focuses on claim 1 of the '002 patent—one of the pURL patents—which requires a sender-based system "that is configured to send (for example, via a sender's web page) data identifying the recipient of the mail piece, and data corresponding to the content of the mail piece." *Id.* at 18; *see* '002 Patent at Col. 6:35–54. Plaintiff argues the patent is inventive because involves "a personalized network address" that is "associated with said recipient" and results in sending the foregoing data to the recipient via "a sender's webpage." *Id.*[7] Plaintiff adds that "UW has failed to show that a pURL was a conventional way of communicating mail information in 2001, before the advent of smart phones. That is because it was not." Opp'n at 18.

The Court finds these claims are directed to the abstract idea of communicating information about a mailpiece by use of a marking; and there is no indication that Plaintiff has done more than used industry-standard technology to communicate this information. Indeed, in the "Background of the Invention" section in both the Personalized QR and pURL patents, it reads, "contents that can be delivered electronically (e.g., advertisements, software, etc.) are often included in mail objects that are delivered via traditional mail services. The drawback with this is that it increases the cost associated with producing and/or delivering the mail object and increase the

---

be directed to "two abstract ideas"). Plaintiff did not formulate the abstract idea in this way in its Opposition. But even if it had and the Court analyzed the SMS patents using this abstract idea, the claims at issue still lack an inventive concept for the reasons discussed. Unlike the *Card Verification* case, "there is no fundamental alteration" to the data in this case. *Netflix*, 114 F.Supp.3d at 943–44. The claims at issue do not provide a technical description but instead consistently refer to routine "steps at 'a high level of generality, which is insufficient to supply an inventive concept.'" *Broadband*, 136 F.Supp.3d at 1241 (quoting *Ultramercial*, 772 F.3d at 716). In many respects, the instant case is similar to *MyMedicalRecords, Inc. v. Walgreen Co.*, Nos. 2:13–00631–ODW (SHx), 2:13–cv–02538–ODW (SHx), 2–13–cv–07285–ODW (SHx), 2:13–cv–03560–ODW (SHx), 2014 WL 7339201 (C.D.Cal. Dec. 23, 2014). In that case, the court wrote,

"Claim 8 does not contain inventive concepts that make it patent-eligible. Claim 8 recites a method for providing a user with the ability to access and collect personal health records in a secure and private manner by: (1) associating access information with the user to access a server storing files; (2) providing a user interface; (3) receiving files at the server from a health care provider; (4) receiving requests through the user interface; (5) sending files; and (6) independently maintaining files on the server. All six of these concepts are routine, conventional functions of a computer and server and therefore broadly and generically claim the use of a computer and Internet to perform the abstract purpose of the asserted claims." *Id.* at *3.

Similarly here, the claims at issue here rely on routine and conventional technology. Thus, even if Plaintiff had presented an alternate formulation of the abstract idea, the claims at issue would still fail at Step Two of the *Mayo* test.

7. The Court notes that claims 3, 12, and 22 of the '093 patent, claims 1, 11, 20, 22, and 29 of the '860, claim 17 of the '269 patent, claim 1 and 9 make reference to either "personalized network location" or "personalized data."

size of the mail object." *See, e.g.,* '093 Patent at Col. 1:48–53. As this description acknowledges, it is commonplace for senders to provide assembly instructions or warranty information and for recipients to acknowledge receipt of mail. The mere fact that the patents allow senders to convey this information electronically is not inventive. As Defendant correctly argues, "claiming the improved speed or efficiency inherent with the applying the abstract idea on a computer" does not amount to an inventive concept. Mot. at 12; *Bancorp Servs., LLC v. Sun Life Assur. Co. of Canada (U.S.),* 687 F.3d 1266, 1278 (Fed. Cir.2011) ("[T]he fact that the required calculations could be performed more efficiently via a computer does not materially alter the patent eligibility of the claimed subject matter."); *see also CLS Bank, Int'l v. Alice Corp.,* 717 F.3d 1269, 1286 (Fed. Cir.2013) ("[S]imply appending generic computer functionality to lend speed or efficiency to the performance of an otherwise abstract concept does not meaningfully limit claim scope for the purposes of patent eligibility."). Plaintiff is not arguing that it invented or improved the underlying technology associated with the "personalized network address" that is "associated with said recipient" and affixed to a mailpiece; rather, Plaintiff's core contention is that it was the first to include affix this information on pieces of mail. But just as above, Plaintiff's argument that standard technology as it existed in 2002 was novel and unconventional does not persuade the Court that any of the claims add an inventive concept.

At bottom, the claims Plaintiff highlights simply encompass standard uses of technology. For instance, the exchange of information between sender and recipient— what Plaintiff refers to as a "bi-direction communication line"—is simply another way of saying transmission of information over a network. This is not inventive. *See buySafe,* 765 F.3d at 1355 ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive."). Further, Plaintiff "does not identify any way in which the claims 'purport to improve the functioning of the computer itself' or 'effect an improvement in any other technology or technical field.'" *IPLearn– Focus,* 2015 WL 4192092, at *6 (quoting *Alice,* 134 S.Ct. at 2359). As described by Plaintiff itself in a letter to Defendant, the IMb patents cover a "process of affixing, storing, receiving, and providing [data]."[8] Patents that cover similar processes have been ruled patent ineligible. *See Content Extraction,* 776 F.3d at 1343 ("The concept of data collection, recognition, and storage is undisputedly well-known."); *see id.* at 1349 ("[N]one of CET [plaintiff's] claims amount to 'significantly more' than the abstract idea of extracting and storing data from hard copy documents using generic scanning and processing technology.").

### 4. Additional Claims & Considerations

Plaintiff points to over 100 additional claims and boldly claims, with little analysis, that those "claims include features that either add to patentability or are themselves patentable," Opp'n at 9–10, the Court finds these remaining claims add only slight limitations that do not alter the conclusion reached above. Plaintiff broadly groups these additional claims into six categories—those that further (1) define the sender-generated mail ID data; (2) define a second set of mail ID data and how it is used; (3) define the mail data, which is personalized for the recipient, and how it is used; (4) define the electronic data—

---

**8.** Plaintiff similarly described the Personalized QR patents as the "process of generating, affixing, submitting, receiving, and providing [data], and the pURL patents as a "process of affixing, submitting, receiving, and providing [data]."

data resulting from the personalized mail data—and how it is provided; (5) define the reception device as a cellular telephone, prior to the advent of smart phones; and (6) define a second set of electronic data and how it used. *Id.* at 10. As noted above, in the Court's view, "[n]one of the remaining asserted dependent or independent claims differ substantially" from the claims analyzed above. *See Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1378 (Fed.Cir.2015); *see also CMG Fin. Servs.*, 50 F.Supp.3d at 1314 (citation omitted) ("Comparing the language of the systems claims with that of the method claims, it is clear that these are functionally identical ... Thus, they must be treated as equivalent for purposes of the § 101 analysis.")

Still, the Court proceeds to consider the claims identified by Plaintiff in his Opposition. Plaintiff specifically points to claims 9 and 16 of the '002 patent and claims 11 and 21 of the '860 patent, which provided a "sender-based system and mail ID data that is personalized for the recipient and used to send at least content data to the recipient via a sender's web page;" claim 1 of the '860 patent which provides a "sender-based system and mail ID data that includes a personalized network address associated with the recipient and used to send content data to the recipient;" claims 1, 10, and 17 of the '629 patent and claims 1, 10, and 20 of the '093 patent that provide a "sender-based system and mail ID data that is personalized for the recipient and used to send at least content data to the recipient." Opp'n at 18. A closer look at these claims, however, reveals they use very similar language as the claims discussed above, and they suffer from the same defects. For instance, claim 9 of the '002 patent describes, "[a] system for providing electronic data to a recipient of a mail object." '002 Patent at Col. 7:10–11; claim 1 of the '860 patent describes, "[a] method for providing electronic data to a recipient of a mail object." '860 Patent at Col. 6:34–35; and claim 10 of the '093 describes "[a] system for providing electronic data to a recipient of a mail object." Variations between these claims are trivial, and they simply incorporate the same purportedly inventive concepts discussed above.

Therefore, the Court does not find anything inventive about these additional claims. Including a "personalized" marker on a piece of mail is not inventive; differences in the content of the information communicated (i.e. the type of data) or the type of device involved are not sufficiently inventive to confer patent eligibility; and, fundamentally, Plaintiff has not identified any way in which these claims "effect an improvement in any other technology or technical field," *IPLearn–Focus*, 2015 WL 4192092, at *6 (quoting *Alice*, 134 S.Ct. at 2359). Again, these claims describe conventional communication that takes place between the sender and a recipient of a piece of mail and rely on routine and conventional technology. Additionally, the Court notes that the claims' general language regarding authentication or encoding of data are not sufficiently inventive. *See, e.g.*, '268 Patent at Col. 7:20 ("The method of claim 1, wherein said step of providing mail verification data further comprises providing at least authenticating data to said at least one reception device."); *see also Kinglite Holdings, Inc. v. Micro–Star Int'l Co.*, No. 2:14–cv–03009, 2015 WL 6437836 (C.D.Cal. Oct. 16, 2015) at 14 ("The Court agrees with Defendants' characterization that these steps simply 'implicate the concept of authentication or verification of a request.' As seen in *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1370–73 (Fed.Cir.2011), claims reciting a method of authentication for security purposes are directed to an abstract idea."). As Defendant notes, "the patent provides no explanation whatsoever of *how* the step of authentication of the

mail ID is accomplished." Mot. at 21. Rather, as with the claims discussed above, the claims consistently refer to routine "steps at 'a high level of generality, which is insufficient to supply an inventive concept.'" *Broadband*, 136 F.Supp.3d at 1241 (quoting *Ultramercial*, 772 F.3d at 716). Thus, the Court does not find the additional independent or dependent claims are sufficiently inventive.

■■■ The Court's conclusion that the asserted claims fail is further confirmed by the application of the machine-or-transformation test. While the machine-or-transformation test is not dispositive when conducting a § 101 analysis, it serves as a "useful and important clue." *Ultramercial*, 772 F.3d at 716 (quoting *Bilski*, 561 U.S. at 604, 130 S.Ct. 3218). Here, as in *Ultramercial*, none of the asserted claims are "tied to any particular novel machine." *Id.* As described above, the claims stress that the invention can be performed using a number of well-known devices. Any references to networks, such as the Internet, are likewise insufficient to tie the claim to a particular novel machine. *See Cyber-Source Corp*, 654 F.3d at 1370 (explaining that the recitation of the Internet as a source of data does not tie a claim to a particular machine). The asserted claims likewise fail to satisfy the transformation prong of the machine-or-transformation test. The system and methods claimed refer generally to the combining of data, or the transmission of data between a sender and recipient of a piece of mail. This does not qualify as transformation within the meaning of the test. *See id.* at 1375 ("[T]he mere manipulation or reorganization of data ... does not satisfy the transformation prong."). Plaintiff did not explicitly reference the machine-or-transformation test in its Opposition; and Plaintiff has failed to convincingly argue the concatenation of data qualifies as a "fundamental alteration to the information itself." *Netflix*, 114 F.Supp.3d at 943–44 (internal quo-

tation marks omitted). And as mentioned above, the SMS patents lack the requisite technical description of how the sender-generated barcode operates. Thus, the asserted claims do not transform any article into a different state or thing. While a claim's satisfaction of the machine-or-transformation test is not dispositive, it underscores why the claims do not supply an inventive concept.

Finally, the Court's conclusion is buttressed by what the Supreme Court characterized as the "pre-emption concern that undergirds our § 101 jurisprudence." *See Alice*, 134 S.Ct. at 2358. The claims in the SMS patents do not meaningfully limit the abstract idea of communicating information about a mailpiece by use of a marking; as a result, the Court has serious concerns that the SMS patents could significantly foreclose future innovation. In contrast to *Intellectual Ventures*, the SMS patents do not disclose a "specific method" of creating the mail identification data, communicating the data, authenticating the data, or receiving that data. *See Netflix*, 114 F.Supp.3d at 948. "Neither the claims themselves nor [Plaintiff's] brief contain any meaningful disclosure of *how*" these methods actually take place, *Netflix*, 114 F.Supp.3d at 948; rather, the SMS patents simply reference the claimed methods in general terms. The Court finds that the claims pertain only to senders of mail is not a meaningful limitation. Because the asserted claims are not limited in any meaningful way, it raises significant concerns that the claims will preempt a large number of ways of communicating information about a piece of mail by use of a marking. This factor further counsels against finding the asserted claims patent eligible.

In sum, the asserted claims, viewed individually or in combination, do not meaningfully limit the abstract idea of communi-

cating information about a mailpiece by use of marking. As a result, the Court finds each of the asserted claims unpatentable under § 101.

## IV. Disposition

For the reasons set forth above, the Court finds the '032 patent, the '268 patent, the '787 patent, the '629 patent, the '093 patent, the '860 patent, and the '002 patents invalid under § 101. Accordingly, Defendant's Motion is GRANTED.

The Clerk shall serve this Minute Order on the parties.